## Chicago Title & Trust Company, Receiver of La Salle Street Trust & Savings Bank, Cross-complainant and Appellant, v. Central Trust Company of Illinois, Cross-defendant and Appellee.

### Gen. No. 26,266.

1. EQUITY—*conclusiveness and effect of master's findings.* The findings of a master to whom a cause is referred are of an advisory nature and only prima facie correct, the facts being open for the consideration of the chancellor and of the reviewing court on appeal.

2. APPEAL AND ERROR—*weight given to chancellor's findings.* It is only where the chancellor has heard the evidence that the Appellate Court will refuse to disturb his findings, unless they are clearly and manifestly against the weight of the evidence.

3. EQUITY—*weight of master's report in comparison with verdict.* The master's report is not given the same effect as the verdict of a jury in a case where a jury trial is a matter of right.

4. BANKS AND BANKING—*admissibility of evidence of subsequent matters in ascertaining depreciation of assets at time of transfer of business.* Persons organizing a state savings bank to take over the business and assets of a national bank effected the loan, in currency, from a trust company of the amount of its proposed capital and surplus which it was essential that it have in cash in order to procure the issue of a charter. The charter having been issued, the trust company received back its currency and the state bank proceeded to do business with a capital and surplus which were represented by the national bank's assets. In a suit by the receiver of the state bank against the trust company to recover the difference between the value of the authorized capital and surplus of the national bank and their actual value at the time of the transfer, where the Supreme Court has held, on the first trial, that the question for determination is the value of such assets on the date of the transfer, on a retrial any evidence of facts occurring either

before or after the date in question which will go to show the value at the date is admissible.

5. BANKS AND BANKING—*crediting subsequent payments in determining depreciation at date of transfer of business.* Persons organizing a state savings bank to take over the business and assets of a national bank borrowed from a trust company currency to the amount of the proposed capital and assets which was' necessary for the issue of the charter. After the charter was procured the currency was returned and the state bank did business with a capital consisting of the assets of the national bank. The state bank having become insolvent, its receiver brought suit against the trust company to recover the difference in amount between the authorized value of the national bank's capital and surplus and its actual value at the time of the transfer. The Supreme Court having held the trust company liable for the deficiency, *held*, on appeal from a judgment on the master's finding on retrial, as to the extent of such deficiency, that value should be given as to each payment made on each of such assets subsequent to the date of the transfer, and as to all set-offs and money obtained by the receiver by compromises, less the expense, if any, of collecting such assets, especially where the evidence shows that in lending and withdrawing the currency, the defendant trust company acted in good faith and with no intent to violate the law.

6. APPEAL AND ERROR—*inconsistent position on retrial of remanded cause.* A party cannot, on the retrial of a case, assume a position which is inconsistent with that which he assumed on the first trial and on the appeal to the Supreme Court and in accordance with which theory the Supreme Court decided the case.

7. BANKS AND BANKING—*neglect or dishonesty of officers of purchaser bank in collecting assets of purchased bank as affecting determination of value of assets at date of sale.* A trust company loaned persons organizing a state savings bank to take over the business and assets of a national bank the currency necessary to the issue of a charter to the state bank. The charter having been procured, the trust company received back the currency. The state bank then proceeded to do business with assets consisting of the assets of the national bank which, together with the liabilities, the state bank had taken over. The state bank, having become insolvent, the receiver brought suit against the trust company to recover the amount by which the assets of the national bank were less than its authorized capital and surplus at the date of the transfer. *Held,* that the trust company could not be held liable for assets which, while collectible at the date of the transfer, became worthless through the failure of the state bank officers to collect or through their dishonesty.

8. BANKS AND BANKING—*tests for determining value of assets at*

Chicago Title & Trust Co. v. Central Trust Co., 224 Ill. App. 474.

*time of transfer of business.* A trust company loaned the persons organizing a state savings bank to take over the assets and business of a national bank the currency necessary to procure a charter, and received back the currency when the charter was issued. The state bank proceeded to do business on a capital consisting of the assets of a national bank which it took over, with the national bank's liabilities. On the insolvency of the state bank, the trust company having been held liable for the difference between the value of the authorized capital and surplus of the national bank and the amount by which it was impaired at the date of the transfer, *held,* on a retrial to ascertain the amount of the deficiency, the trust company was not entitled to be credited with those items which, the evidence shows, would have passed the scrutiny of prudent bankers where the evidence further shows that they were, in fact, worthless.

9. BANKS AND BANKING—*immateriality of examiners' opinion as to solvency of national bank purchased by State bank.* A trust company loaned the persons organizing a state savings bank to take over the assets and business of a national bank the currency necessary to procure a charter, and received back the currency when the charter was issued. The state bank took over the assets and liabilities of the national bank and did business on such assets. The state bank having become insolvent, its receiver brought suit against the trust company, and the latter was held liable for the amount by which the national bank's capital was impaired at the date of the transfer to the state bank. On retrial to determine the amount of such deficiency, *held,* that the fact that bank examiners, who made an examination of the national bank a few months before the transfer, did not think it then insolvent was material, the liability of the trust company not being dependent on the good faith of the parties.

10. BANKS AND BANKING—*when payments made after insolvency allowed in ascertaining depreciation of assets of bank.* A trust company loaned the persons organizing a state bank to take over the assets and business of a national bank the currency necessary for them to procure the issuance of a charter, and received the currency back on the issue of the charter. The state bank then did business on a capital consisting of the assets of the national bank which it took over with its liabilities. The state bank became insolvent and, at the suit of the receiver, the trust company was held liable for the amount by which the national bank's capital was impaired at the date of the transfer to the state bank. On a retrial to determine the amount of such deficiency, *held,* that where the evidence showed, as to an item of such assets, that the debtor borrowed money from the state bank, after the transfer, to pay his debt to the national bank, the payment should not be allowed as a credit in determining the value of the assets, but where

Chicago Title & Trust Co. v. Central Trust Co., 224 Ill. App. 474.

the payment was made by money procured from another source than the state bank, such payment should be credited, as having augmented the assets of the national bank at the transfer date.

11. BANKS AND BANKING—*ascertainment of value of subsequent renewal notes in determining assets of bank at time of transfer of its business.* A trust company loaned persons desiring to organize a state bank to take over the business and assets of a national bank cash to the amount of the proposed capital and surplus, such cash being necessary to procure the charter. On the issuance of the charter the trust company was repaid the cash. The state bank then did business on the assets of a national bank, which it took over. The state bank becoming insolvent, its receiver sued the trust company and recovered judgment for the amount by which the national bank's capital was impaired at the date of the transfer of its assets and liabilities. On retrial to determine the amount of the deficiency, *held,* that in ascertaining the national bank's assets at that date credit could not be allowed for the substitution of a renewal note, after the transfer, to take the place of one in the national bank at the date of the transfer.

12. APPEAL AND ERROR—*controlling effect of directions of Supreme Court on remand on Appellate Court on appeal from judgment on retrial.* The Appellate Court is bound by the specific directions of the Supreme Court on the remand of a cause to the circuit court with directions, and cannot consider, on appeal from the judgment of the circuit court, questions which lie outside of the directions.

13. BANKS AND BANKING—*books of bank as prima facie evidence of value of assets.* A trust company loaned persons desiring to organize a state savings bank to take over the business and assets of a national bank cash to the amount of the proposed capital and surplus, to enable them to procure a charter. On the issuance of the charter this loan was returned and the state bank did business with a capital consisting of the assets of the national bank which, together with the latter's liabilities, had been transferred to it. The state bank becoming insolvent, its receiver sued the trust company and recovered judgment for the amount by which the national bank's capital was impaired at the date of the transfer of its assets and liabilities. On retrial to determine the amount of such deficiency, *held,* that the books of the national bank were competent against the receiver, in the absence of proof that they were irregularly kept or not kept in the regular course of business to show the value of its assets as against the receiver, and that the entries in such books made out a prima facie case.

14. COSTS—*when receiver for benefit of creditors not liable.* On appeal from a judgment on retrial of a case to determine the amount due from defendant to a receiver for the benefit of creditors, *held,*

under the facts and the relief awarded, that the costs were taxable to defendant.

Thomson, J., dissenting in part.

Taylor, J., specially concurring.

Appeal from the Circuit Court of Cook county; the Hon. Jesse Holdom, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1920. Decree modified and affirmed. Opinion filed April 5, 1922.

Hiram T. Gilbert, for appellant.

Albert Fink, for appellee.

Mr. Presiding Justice O'Connor delivered the opinion of the Court.

By this appeal the Chicago Title & Trust Company, as receiver of the La Salle Street Trust & Savings Bank, seeks to reverse a decree of the circuit court of Cook county whereby the Central Trust Company of Illinois was decreed to pay to the receiver $79,189.42, with interest thereon at the rate of 5 per cent per annum from September 24, 1915, together with certain costs.

The record discloses that on a former trial between the same parties the Central Trust Company was decreed to pay to the receiver $1,487,854.16. From that decree an appeal was taken to the Supreme Court of this State where the decree was reversed and the cause remanded with directions to refer the matter in controversy to a master in chancery. *Golden v. Cervenka*, 278 Ill. 409. Pursuant to the directions of the Supreme Court the matter was referred to a master in chancery to take the evidence and to make up his report. By the decision of the Supreme Court it was held that if the authorized capital and surplus, $1,250,000, of the La Salle Street National Bank was impaired at the time its assets were transferred to the La Salle Street Trust & Savings Bank, October 21, 1912, the Central Trust Company was liable to the creditors of the Trust & Savings Bank to make good such deficiency. And it was further held that upon such hearing before

the master the burden of proving the value of the capital stock would rest upon the Central Trust Company. Pursuant to such directions the matter was referred to a master in chancery. During the pendency of the suit the receiver, William C. Niblack, died, and the Chicago Title & Trust Company was appointed in his stead. The latter company prosecutes this appeal claiming that the evidence taken before the master showed that the capital and surplus of the National Bank on October 21, 1912, was entirely lost and, therefore, the Central Trust Company should have been decreed to pay to the receiver $1,250,000, being the authorized amount of the capital and surplus of the National Bank, together with interest thereon at the rate of 5 per cent per annum from September 24, 1915. On the other hand, the position of the Central Trust Company is that the evidence in the record shows that on October 21, 1912, there was no impairment of the capital and surplus of the National Bank and, therefore, it was error for the circuit court to decree that it pay to the receiver any amount, and on this ground the Central Trust Company assigns cross errors, properly bringing their contention before this court for decision.

The record is extremely voluminous. The evidence taken before the master consists of 13,571 pages. The master's report, together with exceptions thereto, contains 525 printed pages. The receiver has filed a printed argument of 931 pages, and the Central Trust Company's brief and argument contains 1875 pages. The history of the National Bank and of the Trust & Savings Bank is set forth in the opinion of the Supreme Court, so that it will not be necessary to state more than a few of the facts in that regard here. Under the decision of the Supreme Court there was but one question to determine on the retrial of the case, and that was to find the value of the net assets of the National Bank as of October 21, 1912. These assets

were made up of a great number of items, of which more than 200 are controverted and discussed in the printed arguments here. In placing a value on these 200 items as of October 21, 1912, it was necessary for us to examine the evidence of a great many separate businesses and enterprises. For example, if a promissory note was in the National Bank on the date in question, to determine whether that note was of value at that time, of course, we had to investigate the assets and liabilities of the maker, and if the maker was engaged in various lines of business, and had interests in other businesses, it was necessary to go into each of these to see what assets and liabilities he had on that date to determine the value of his paper. We simply make reference to these matters here because we find it necessary that our opinion should be of great length. In addition to investigating the facts, about 15 questions of law are also argued. But since we have decided that it is necessary for us to examine the evidence with reference to each contested item of assets, we think it proper to discuss such evidence and the law in passing on each of such items separately, and, therefore, it will only be necessary here for us to pass generally upon the contentions of the respective parties.

The Central Trust Company contends that the decree of the circuit court, confirming the master's report, is conclusive as to the controverted questions of fact because the evidence on the questions of the value of certain items (and this was the only question to be determined) was conflicting. And further, that since the cause was referred to a master who had seen and observed the witnesses testifying, his findings would not be disturbed unless clearly and manifestly against the weight of the evidence. Of course, under the law, the decree of the circuit court is not conclusive on this court, but it is our duty to examine the evidence. The master's findings are only prima facie correct—of an

advisory nature only. The facts are all open for the consideration of the chancellor in the first instance, and afterwards by the Appellate or Supreme Court in case of an appeal. It is only where the chancellor has heard the evidence that we will refuse to disturb his findings, unless they are clearly and manifestly against the weight of the evidence. The master's report is not given the same effect as the verdict of a jury in a case where a jury trial is a matter of right. *Larson v. Glos*, 235 Ill. 584; *Kelly v. Fahrney*, 242 Ill. 240. Under the law, therefore, the only way this case can properly be decided is by a most careful consideration of the evidence. The Central Trust Company contends, however, that upon an examination of the evidence it will be found that the master is sustained by the overwhelming weight of the evidence, and that the decree should, therefore, be affirmed. These questions of law contended for by the Central Trust Company make little or no practical difference in this case, for we substantially agree with the master as to almost every proposition of law which he announces in his report. But we do differ from him in the application of the law to the facts, as found, as to many of the items of assets, which are hereinafter set forth in detail.

There is some complaint that the master admitted evidence of facts occurring after October 21, 1912, on the ground that under the decision of the Supreme Court, facts occurring subsequently are of no importance. We think this is a misapprehension of that decision. The opinion there is specific that the question for determination upon a retrial of the case is the value of the assets of the National Bank on October 21, 1912, and, of course, any evidence that would tend to throw light on this subject was admissible, whether evidence of facts occurring before or after that date. The evidence could not be limited to any specific period of time. But the test is, would such evidence tend to

prove the value of the particular asset on October 21, 1912.

The National Bank commenced business on May 7, 1910, and conducted its bank in Chicago until October 21, 1912, when its assets were turned over to the Trust & Savings Bank. The latter bank continued to operate until June 12, 1914, when it was closed by the Auditor of Public Accounts of this State and a receiver appointed. A great many items of assets in the National Bank on October 21, 1912, were paid in whole or in part to the Trust & Savings Bank after that date. A number of other items came to the receiver, and as to some of them he succeeded by set-offs, compromises and otherwise in securing partial or full payment. And in all of such cases the master allowed the amount obtained in computing the impairment of the capital and surplus of the National Bank. He did so, as stated by him, on the theory that these amounts obtained by the receiver tended to show value of the particular item as of October 21, 1912, and it is strenuously argued by counsel for the receiver that in most of these instances the master was wrong; that where it appears from the evidence that certain notes in the bank on October 21, 1912, were renewed from time to time and partial payments made, and there being no evidence of the financial responsibility of the maker of the note as of October 21, 1912, no credit should be allowed for such payments. He further contends that, of course, no value should be given where the receiver was required to resort to suit to enforce collection. There is a great deal of argument on this question by counsel for both parties, and we have given it most careful consideration. We have come to the conclusion that under the record in this case and the opinion of the Supreme Court, value should be given in every case where payment has been made, as this would tend to prove value as of October 21, 1912. But even if it might appear that the evidence did not indicate

value as of that date, we think that wherever payment has been made value should be given by virtue of such payment itself. Of course, where the evidence shows that expense has been incurred in making any collection, that expense should be deducted from the amount collected before crediting the assets of the National Bank.

The receiver, in his cross-bill on which he bases his cause of action, alleges that the National Bank for more than six months prior to October 21, 1912, was in an unsafe condition, "its capital stock and surplus having been theretofore entirely lost and its assets not then being more than sufficient in value to satisfy its then liabilities to its creditors." Counsel for the receiver, on the first trial, put in evidence statements prepared by Hiram B. Kadish, an expert accountant who had examined the books and papers of the National Bank and prepared a large number of statements summarizing the indebtedness to it and its condition at the close of business on October 21, 1912. The decree of the circuit court entered on that trial found that the capital and surplus of the National Bank were entirely lost on that date. An examination of the receiver's brief filed in the Supreme Court on the appeal of that case shows that the statements prepared by Kadish gave credit for the amount of the collections made by the receiver. And counsel for the receiver there contended that even though credit be given for such collections, the capital and surplus were shown to have been entirely lost. On the other hand, counsel for the Central Trust Company there contended that if Kadish's figures could be regarded as representing the actual status of the bank, they would indicate that the impairment of the capital stock was $600,000 only, leaving a surplus of approximately $400,000. On that presentation the Supreme Court held that Kadish's statements did not show that the capital was entirely lost on October 21, 1912, but that they would indicate there was still a value of $400,000.

In speaking of this question, and referring to the statements prepared by Kadish, the Supreme Court, speaking through Mr. Justice Dunn, beginning at p. 431, said: ''The statement of the national bank on October 21, 1912, shows its capital stock, surplus and undivided profits to be $1,267,815.72. Whether or not this amount had been impaired depends upon the collectibility of the loans which constituted a large part of the resources of the bank. In regard to this, Kadish presented a statement showing bills receivable held by the National Bank on October 21, 1912, which remain unpaid in the Trust and Savings Bank, or were transferred by it to other banks and remain unpaid, or for which other paper which still remains unpaid was substituted, and showing the accounts paid to the receiver allowed as set-offs and obtained by compromises.'' Continuing, the court said that the statement showed amounts ''which the receiver collected in cash, by set-offs and compromises, in the sum of $161,064.61, leaving a net amount according to this statement, of $748,242.43. Counsel for appellants (the receiver) * * * say that if these figures could be regarded as accurately representing the impairment of the stock and surplus of the National Bank, they would indicate that the impairment of the capital stock was only to the extent of about $600,000, still leaving $400,000 of value. These figures certainly do not sustain a finding that the capital stock and surplus of the bank had been entirely lost and that the value of its assets was not sufficient to satisfy its liabilities to its creditors.'' From the foregoing, therefore, it clearly appears that on the former trial the receiver took the position that an allowance should be made for all set-offs and moneys obtained by the receiver by compromises, and having there taken such position both at the trial and in the Supreme Court, and the Supreme Court having decided the case on that theory, he ought not now on a retrial of the case be permitted to shift his posi-

tion and say that no allowance should be made for such set-offs or compromises. However, we are of the opinion that in the equitable situation before us, it is only just and proper that allowances be made for any payments made to the Trust & Savings Bank, and for any set-offs and other moneys obtained by the receiver from the assets of the National Bank. Under the Supreme Court opinion the Central Trust Company was held liable on the ground of estoppel, and not on the ground that it had done an intentional wrong. The Supreme Court said in the *Golden* case (p. 427): "It is also immaterial whether the Central Trust Company or Dawes had any fraudulent intention, knew anything about the condition of the National Bank, or made any profit out of the transaction. The trust company is estopped, as against creditors who had a right to rely upon the auditor's certificate, to deny that the cash exhibited was the property of the Trust and Savings Bank, for which the trust company must account as a part of the bank's capital. The receiver, who represents the creditors as well as the stockholders of the bank, may in equity require the restoration of the fund for the benefit of the creditors." We think the Central Trust Company and Dawes acted entirely innocently in the matter, and were doing a mere act of courtesy for Lorimer and his bank. There is no contention that the Central Trust Company or Dawes received any remuneration for what was done. The matter of organizing the Trust & Savings Bank and the turning over of the assets of the National Bank to it was all fully explained to the officials of the State banking department, and everyone connected with the matter seems to have acted in entire good faith. They all thought that what they were doing was a substantial compliance with the law of this State. We had occasion to consider this question in another phase of this case in *Golden v. Cervenka,* 216 Ill. App. 397, where we said (p. 402): "We

think it clear that neither the Central Trust Company nor its officers in the transaction had any idea that they were violating any provision of the law, as it appears that the entire transaction was explained and the facts known to the representative of the auditor's office. In fact, we think that everybody concerned in the matter thought that what they were doing was in substance a compliance with the law." And we there further said that the Central Trust Company did (unwittingly) a legal wrong. And after a most thorough examination of the record before us we are confirmed in the statement we there made. In these circumstances, we think it would be highly inequitable and not within the opinion of the Supreme Court to refuse to consider payments made to the Trust & Savings Bank and moneys obtained by the receiver. But counsel for the receiver further contends that under the opinion of the Supreme Court no credit for moneys obtained from the assets of the National Bank, by the Trust & Savings Bank or its receiver, should be considered in valuing the assets of the National Bank as of October 21, 1912, unless such payments would indicate value of such assets in the opinion of prudent bankers. And in this connection, the language of the Supreme Court (beginning at p. 432) is pointed out: "The solvency of the bank on October 21, 1912, is not, however, to be determined by the condition of the assets of the Trust and Savings Bank on June 11, 1914. The question is not what was the value of the assets of the bank, as ascertained by their final collection, but what was the value on the date of the transfer. If upon an examination of the bank at that time, in the judgment of prudent bankers familiar with the credit of the debtors, the value of the loans of the bank was equal to the amount at which they were carried on the books of the bank, the capital of the bank cannot be regarded as impaired at that time because it eventually turned out that a portion of the loans could not

be collected." This language was used after the court had disposed of the question whether the capital stock had been entirely lost, and, in connection with this, it allowed the amounts collected and obtained by the receiver. So that it appears from the opinion of the Supreme Court that after making an allowance for moneys obtained from the assets of the National Bank after October 21, 1912, that court turned to consider another proposition which they foresaw might arise on a retrial of the case, viz., that some notes and other assets of the National Bank on October 21, 1912, might then be perfectly good and collectible, and later the makers of such notes, and other debtors of the National Bank, be unable to pay their obligations. Of course, if assets of the National Bank on October 21, 1912, were then of value but afterwards became worthless or of little value, no one would contend that the Central Trust Company would be in any way liable for a failure to collect such assets.

Counsel for the receiver also contends that where the evidence shows any item of asset in the National Bank on October 21, 1912, was then good but subsequently through the failure of the officers of the Trust & Savings Bank to collect such item, or through the dishonesty of such officials the assets were dissipated and rendered worthless, the Central Trust Company should be held liable, for the reason that the Central Trust Company occupies no better position than the officers and directors of the Trust & Savings Bank. With this contention we cannot agree. We are of the opinion that the liability of the Central Trust Company could in no way be affected by any dereliction or wrongdoing of the officers of the Trust & Savings Bank.

We do not agree with the contention of counsel for the Central Trust Company wherein he argues that credit should be given for those items which the evidence shows would have passed the scrutiny of pru-

dent bankers and no credit was given by the master, for it appears from the evidence that as to such items the bankers were not cognizant of all the facts. And we are clearly of the opinion that even if an item of asset in the National Bank was actually approved by prudent bankers, no allowance should be made if the evidence showed that such item was worthless. In fact, the record discloses that there are but two or three items in the entire record concerning which prudent bankers testified. Neither do we think that the fact that some bank examiners, who made an examination of the National Bank some few months prior to October 21, 1912, and who did not think the bank then insolvent, is material here, because the liability of the Central Trust Company does not depend upon the good faith of the parties to the transaction.

Counsel for the Central Trust Company insists that where the evidence shows that debts due the National Bank were later merged in the liabilities of another debtor and that payments were made upon the latter, such payments extinguished *pro tanto* the earliest indebtedness, nothing appearing to the contrary. And, further, that where a new note was given to procure a new loan and was discounted by the Trust & Savings Bank, and a check drawn against the proceeds thereof for the amount, this was a payment of the former note and not a renewal thereof. The first of these two contentions is based on the law as announced by Sir William Grant, master of the rolls, in *Devaynes v. Noble,* 1 Merivale 529. The rule there announced is as follows: In the case of a banking account where all the sums paid in form one blended fund, of which the parts have no distinct existence, there is no room for any other appropriation of payment than that which arises from the order in which the receipts and payments take place. Presumably it is the first sum paid in that is first drawn out. It is the first item on the debit side that is discharged or reduced by the first

item on the credit side of the account. The appropria-
tion is made by the very act of setting the two items
against each other. The master adopted this rule, but
we think it has no application to the instant case.
Wherever the evidence shows that a debtor of the
National Bank on October 21, 1912, subsequently bor-
rowed additional money from the Trust & Savings Bank
and then paid his obligation, we think no credit should
be allowed, because the assets, as of October 21, 1912,
were not augmented by such payment. But where the
evidence shows that payment was made by money
from sources other than the Trust & Savings Bank, we
have given credit accordingly. Nor do we think the
substitution of a new note for one that was in the bank
on October 21, 1912, can be taken into consideration in
valuing the assets of the National Bank, where the new
note has not been paid, no money being brought into
the Trust & Savings Bank by virtue of such exchange.
In these circumstances, certainly no consideration
should be given to such matters in valuing the assets
of the National Bank.

The Central Trust Company makes the further con-
tentions that (1) the chancellor erred in overruling its
motion for a decree in its favor notwithstanding the
findings as to the value of the capital stock, for the
reason that prior to the commencement of the suit the
receiver should have tendered to the Central Trust
Company the bills receivable and other assets in his
hands, which, or the successors thereof, were taken
over by the Trust & Savings Bank from the National
Bank, but which the receiver failed to do, and for the
further reason that he failed, after the commencement
of the suit, to take any action with respect to the un-
disposed bills receivable and other assets which, or the
successors thereof, were so taken over by the Trust &
Savings Bank, after first consulting with and obtain-
ing the consent of the Central Trust Company; and
(2) that to hold it liable in this case would be in con-

travention of section 1 of the fourteenth Amendment of the Constitution of the United States. Counsel for the Central Trust Company devotes many pages of his argument to these contentions, but in the view we take of the matter, we are of the opinion that we are bound by the specific directions of the Supreme Court in the *Golden* case, and, therefore, these are questions we cannot consider here.

Counsel for the receiver contends that the books of the National Bank were not competent evidence to establish the value of any asset as against him. No complaint is made that the books were not kept in the regular order of business, nor that they were not accurately kept. We think that they were competent, and we have treated the entries as making out a prima facie case, unless other evidence was introduced to show that, for instance, where they purported to show payment, there was such a course of business dealings as would indicate that the transactions were mere bookkeeping entries, and in no such instance have we given value to any asset without further evidence. Since we will, in this opinion, consider each item of assets, giving the facts, as shown by the evidence, and our conclusions under the law applicable, we think nothing further should here be said, but we proceed to the several items of assets and liabilities, as follows:

(Here follows a discussion of each item of asset and liability of the bank, covering 312 typewritten pages of the opinion, omitted by direction of the court.)

Pursuant to the foregoing, we find the assets and liabilities of the La Salle National Bank as of October 21, 1912, to be as follows:

### Assets.

| | | |
|---|---|---:|
| (1) | Cash | $ 231,555.91 |
| (2) | Exchange for Clearing House | 47,386.36 |
| (3) | Redemption in U. S. Treasury | 32,500.00 |
| (4) | Due from National Banks | 313,305.46 |
| (5) | Due from State Banks | 151,010.01 |

| | | |
|---|---|---:|
| (6) | Accrued interest on amounts due from National and State Banks. | 206.09 |
| (7) | Cash items | 426.88 |
| (8) | Overdrafts | 2,952.68 |
| (9) | U. S. Bonds to secure circulation.. | 658,018.75 |
| (10) | Bonds to secure postal savings deposits | 78,409.76 |
| (11) | Other stocks and bonds | 187,115.88 |
| (12) | Furniture and fixtures | 5,950.00 |
| (13) | Loans and discounts | 1,964,583.89 |
| (14) | Funds in transit | 166,938.18 |
| (15) | Bank building acc't | 25,000.00 |
| | Total | $3,865,359.85 |

Liabilities.

| | | |
|---|---|---:|
| (1) | Individual deposits | $1,852,969.64 |
| (2) | Accrued interest on individual deposits | 941.51 |
| (3) | Savings deposits | 109,903.36 |
| (4) | Accrued interest on savings deposits | 720.00 |
| (5) | Postal savings deposits | 58,011.89 |
| (6) | Accrued interest on postal savings deposits | 425.05 |
| (7) | Due National Banks | 192,886.52 |
| (8) | Due State Banks | 200,768.70 |
| (9) | Accrued interest on amount due National and State Banks | 468.96 |
| (10) | Time certificates of deposit | 98,727.50 |
| (11) | Accrued interest on time certificates of deposit | 683.78 |
| (12) | Demand certificates of deposit | 4,000.00 |
| (13) | Accrued interest on demand certificates of deposit | 6.01 |
| (14) | Marginal certificates of deposit | 27,500.00 |
| (15) | Accrued interest on marginal certificates of deposit | 15.79 |
| (16) | Cashier's checks | 41,461.93 |
| (17) | Certified checks | 50,440.32 |
| (18) | Expense vouchers | 39.25 |
| (19) | Circulation | 647,495.00 |
| (20) | Circular expenses | 2,109.89 |

492    APPELLATE COURTS OF ILLINOIS.

Chicago Title & Trust Co. v. Central Trust Co., 224 Ill. App. 474.

| (21) | Certain liabilities not shown on the books | 3,254.43 |
| (22) | Personal property taxes | 6,000.00 |
| (23) | Liability to non-consenting stockholders | 53,250.00 |
| (24) | Legal fees | 500.00 |

Total .......................$3,352,580.39

Therefore, the net value of the assets of the National Bank as of October 21, 1912, being the difference between $3,865,359.85 and $3,352,580.39, is $512,779.46. From this it follows that the impairment of the capital and surplus of the National Bank, as of October 21, 1912, being the difference between $1,250,000 and $512,779.46, is $737,220.54.

From this it, therefore, follows that the Central Trust Company is liable for the $737,220.54, with interest thereon at the rate of 5 per cent per annum from September 24, 1915, to this date, April 5, 1922, which is $240,808.57, making the aggregate amount of the liability of the Central Trust Company $978,029.11.

The chancellor, in entering the decree, found from the admissions of counsel in open court that the taxable costs of the receiver were $16,203.52, and the taxable costs of the Central Trust Company were $15,957.12, and it was decreed that the receiver pay one-third and the Central Trust Company two-thirds of these costs. The receiver contends that no part should be taxed against him on the ground that the litigation was made necessary by the wrongful act of the Central Trust Company. In our opinion, the contention of the receiver must be sustained. The record discloses that the Central Trust Company was held to be liable to restore to the Trust & Savings Bank $1,250,000, on the ground that it was estopped from contending that this money was not the money of the Trust & Savings Bank. The Supreme Court further held that the creditors, only, of the Trust & Savings Bank could complain, and if it appeared that the assets

of the National Bank, which were turned over to the Trust & Savings Bank on October 21, 1912, were equal to $1,250,000, then the creditors could not complain and the Central Trust Company would not be required to restore any amount; and, further, that the liability of the Central Trust Company should be credited to the extent of such value as it could be shown the net assets of the La Salle National Bank had on October 21, 1912. It was also held that upon the trial of this issue the matter should be referred to a master in chancery to take proofs, and the burden of establishing the value of such assets was placed upon the Central Trust Company. To meet this burden, the Central Trust Company necessarily introduced a great deal of evidence. The court costs in question were all substantially occasioned by the reference to the master. There is no claim that any evidence introduced by the receiver was unnecessary or improper. In those circumstances, we think it would not be equitable to require the creditors of the bank to pay any part of these costs.

We, therefore, are of opinion that the chancellor erred in failing to decree that the Central Trust Company pay the costs which the receiver incurred, viz., $16,203.52.

For the foregoing reasons, the decree of the circuit court of Cook county is modified as to the amount the Central Trust Company is required to pay to the receiver and as to the payment of costs, and the Central Trust Company is here decreed to pay to the receiver the sum of $978,029.11, together with the further sum of $16,203.52, costs. In all other respects the decree of the circuit court is affirmed.

Since the amount that the Central Trust Company was decreed to pay in the circuit court was increased in this court by substantially $650,000, we think the costs in this court should likewise be borne by the Central Trust Company.

*Decree modified and affirmed.*

MR. JUSTICE THOMSON dissenting in part:

The principles of law, applicable to the questions of fact involved in this case, as announced by our Supreme Court in *Golden v. Cervenka,* 278 Ill. 409, at 430-433, are binding upon this court. The basic question, upon which I am not entirely in agreement with the foregoing majority opinion, involves the interpretation of the opinion of the Supreme Court.

In the case of a number of items among the assets of the National Bank, the opinion of the majority of this court finds, in effect, that they had a value, as of October 21, 1912, as ascertained by their final collection. As to many items, the form of the finding is that the Central Trust Company should be allowed a credit on the amount of its liability, equal to the amount collected on the items by the Trust & Savings Bank or by the receiver. Under the decision of the Supreme Court, no allowance can be made except on the basis of the value of the items in question, as of the date of the transfer, namely, October 21, 1912. Therefore, if, such credits are given, based upon ultimate collections, in whole or in part, it is in effect a finding that the items on which the credits are given were of the value of the ultimate collections on the date referred to. In my opinion, to hold that wherever the evidence shows that a note held by the National Bank as a part of its assets on October 21, 1912, was ultimately collected in whole or in part by the Trust & Savings Bank or by the receiver, with or without suit, or in partial payments, it therefore had a value, on the date referred to, equal to the amount so ultimately collected or recovered on it, is directly contrary to the opinion of the Supreme Court. In my opinion, there is no proper basis for the conclusion, stated in the majority opinion, to the effect that, on the original hearing of this case, the receiver took the position that allowances should be made for all set-offs and amounts collected by the Trust & Savings Bank, nor is there any basis

for the statement there made to the effect that in the decision of the Supreme Court in the case of *Golden v. Cervenka,* that court, "allowed the amounts collected and obtained by the receiver." As I understand the decision and opinion, the Supreme Court did not do that, nor did it have any occasion to, for that matter was in no way involved in the record or the issues before the Supreme Court in that case.

In its opinion, the Supreme Court, having pointed out that, while the evidence in the record then before the court might indicate an impairment of capital, it did not show a condition of insolvency at the time of the transfer from the National Bank to the Trust & Savings Bank, proceeds to hold that the question of whether or not the amount of the capital and surplus of the National Bank had been impaired, "depends upon the collectibility of the loans which constituted a large part of the resources of the bank." The decision of the majority, as to those items of assets, on which I feel obliged to dissent, is based upon an interpretation of the opinion of the Supreme Court to the effect that it means that the question of whether the capital and surplus of the National Bank had been impaired at the time of the transfer depends upon whether the loans, which constituted a large part of the resources of the bank, were finally *collected.* Certainly, if the Supreme Court meant that, it would have said so very clearly and would have fixed the liability of the Central Trust Company at $1,250,000, less the difference between the total amount collected by the Trust & Savings Bank or ultimately recovered by the receiver on the items of assets, and the amount of the liabilities. But, in its opinion, the Supreme Court has not said that, but on the contrary has said that the extent of the liability of the Central Trust Company is the difference between $1,250,000 and the value of the net assets of the National Bank *"on the date of the transfer."*

That the Supreme Court, in holding that the ques-

tion of whether the net assets which came to the Trust & Savings Bank in lieu of the $1,250,000, and representing the capital and surplus of the bank, had been impaired, depends upon the "collectibility" of the loans which constituted a large part of the resources of the bank, did not have in mind the question of what might ultimately have been "collected" on the loans, is to my mind, made absolutely clear by what the court says on the following page (432) of the opinion. After referring to some of the evidence shown by the record, then before the court, and the contentions of the parties, the court proceeds by saying: "The solvency of the bank on October 21, 1912, is not, however, to be determined by the condition of the assets of the Trust & Savings Bank on June 11, 1914. (The date the bank suspended and went into the hands of the receiver.) *The question is not what was the value of the assets of the bank as ascertained by their final collection, but what was the value on the date of the transfer."* (October 21, 1912.)

The court says further: "If upon an examination of the bank *at that time,* in the judgment of prudent bankers *familiar with the credit of the debtors,* the value of the loans of the bank was equal to the amount at which they were carried on the books of the bank, the capital of the bank cannot be regarded as impaired at that time *because it eventually turned out that a portion of the loans could not be collected."* In other words, the value of a loan carried by the bank on October 21, 1912, and appearing among its assets, depends upon its then *collectibility,* but not upon the amount ultimately collected upon it. For example, the bank may have held the note of A. on October 21, 1912, for $10,000, secured by bonds in the sum of $20,000 in the A. Company. Admittedly, let us say, A. was worth $50,000 over and above his liabilities on October 21, and the bonds of the A. Company had a market value of par or higher. The note was due three months

after the transfer. But, a month before it fell due, the A. Company had a disastrous fire which was a total loss. The insurance companies failed and A. became insolvent and the bank recovered little or nothing on the note. We all agree that, in considering that note as part of the assets of the National Bank, we must value it, as of the date of the transfer, October 21, 1912, at its face value, namely, $10,000.

But let us consider the converse of that proposition. Let us assume, the note of A. and the bonds of the A. Company were in fact worthless on October 21. The company shortly thereafter went into bankruptcy and the bonds paid nothing. Suit was brought against A. and judgment recovered and execution levied on a home he had which was worth but little above a mortgage which was on it, and the homestead value. But assume that a brother of A. came to his rescue, and, to relieve him, persuaded the bank to take $2,000 in satisfaction of its judgment. In considering the note of A. as a part of the assets of the bank, the majority would give it a value of $2,000. In my opinion, that course is not warranted by the decision of the Supreme Court nor by anything said by the court in its opinion. It is the value of the note *on the date of the transfer* that must be found. If it was admittedly of no value, then it can be given no value as a part of the then assets of the bank, irrespective of whether anything was ever collected on it or even though it may ultimately have been collected in full, unless the circumstances of the collection were such as to import value on October 21, 1912.

The Supreme Court has held that under our State banking laws, the Trust & Savings Bank should have had $1,250,000, the full amount of its capital and surplus, in hand, in cash and available for use for banking purposes, at the time it received its charter. To comply technically with the law, the Central Trust Company supplied currency to that amount, so that the

498 · Appellate Courts of Illinois.

Chicago Title & Trust Co. v. Central Trust Co., 224 Ill. App. 474.

representative of the State auditor might count it and issue the charter to the new bank, and, that having been accomplished, the Central Trust Company took back its $1,250,000 and the new bank proceeded with a capital and surplus represented by the assets of the National Bank, and having assumed its liabilities. The court further held that if the value of the assets of the National Bank, less its liabilities, then equalled $1,250,000, the creditors may not complain although the law was not complied with. In determining this question the assets must be taken at the value they had on October 21, 1912. The creditors and depositors had a right to rely on the representation afforded by the charter, namely, that the bank had $1,250,000 in its hands, in cash, when it organized. The effect of the decision of the Supreme Court is that the creditors cannot complain if it was not cash, provided the full value was then there, and was of such form as to be as available for banking purposes as the cash would have been. It follows that the question is, as to any item included in the assets taken over by the Trust & Savings Bank, what was its value to the bank on October 21, 1912, for banking purposes? Of course, if it could not have been rediscounted anywhere and could not have been collected or turned into money, it was worthless to the bank for banking purposes and should be given no value. The fact that one, two or three years later the bank or the receiver, by suit or through bankruptcy proceedings or a compromise, recovered something on it, should not be held to have the effect of giving the paper value to that extent in the hands of the bank on October 21, 1912. Such value did not improve the condition of the paper in the hands of the bank on that day, for the purpose of running a bank. What the bank's charter, which had been issued as a result of the representation that the $1,250,000 furnished by the Central Trust Company was the cash capital and surplus of the Trust & Savings Bank, as-

sured the public and the bank's creditors and depositors was that the bank had been authorized by the State of Illinois to do a banking business as a State bank, with $1,250,000 in cash and available in its hands for banking purposes, and before any paper that took the place of that cash can be given the value of cash, it must be demonstrated not only that it then had that value but that it was as suitable for banking purposes as cash would have been.

To hold otherwise would amount to saying that if a State bank, under the circumstances present here, procured a charter and proceeded to business with little or no cash but, instead, with a lot of commercial paper, which at the time had no cash or rediscount value whatever, and, therefore, was worthless for banking purposes, the creditors nevertheless could not complain, provided, the bank having failed, its receiver succeeded by suit or otherwise in ultimately reducing the paper to its cash value in full. Certainly such is not the law. What the public has a right to rely upon as the result of a State bank charter is not that the bank started out with a lot of paper that a receivership can succeed in collecting, but with cash, or assets just as available and valuable and suitable for banking purposes as cash.

Of course it may well be that a loan held by the National Bank on October 21, 1912, and making up a part of its then assets, may be shown to have been later paid, under such circumstances as to warrant a finding that it was worth its face value on that date. For example, the note of A. for $10,000 held by the bank on October 21, and due November 15, or December 15, may be shown by the bank's books to have been paid on its due date, apparently in cash by its maker and without any increase in the liability account of the maker, in the bank. In such a case, in my opinion, the facts are such as to lead reasonably to the conclusion that the note was worth its face value to the

bank for banking purposes on October 21. There are a number of items thus found by the majority opinion to have been of value equal to their face, by reason of their payment and where the circumstances surrounding the payment are such as to warrant such finding, in my opinion,—as in the foregoing illustration, and as to such items, I concur in the findings. But where the circumstances are not such as reasonably to lead to a conclusion that the items were of value equal to the payments ultimately accomplished, I feel obliged to dissent for the reason that in my opinion they do not come within either the letter or the spirit of the decision of the Supreme Court.

But counsel for the Central Trust Company contends that not to give a note in the National Bank on October 21, the value which ultimately may have been collected upon it, no matter what the circumstances, "would allow the receiver double collection on the item, once from the maker and again from the Central Trust Company." In my opinion, that contention is entirely beside the question involved here and has no application to the issues presented in this case. This is not a suit between the debtor and creditor, involving proper credits to the debtor on all payments he may have made at any time on his indebtedness. In other words, this case is not one for the application of payments as between debtor and creditor. What the Supreme Court directed to be inquired of by the master is not how much was ultimately collected on a given note but whether on October 21, 1912, it was a *collectible* note. A note may on that date have been such as to warrant the court in finding it was then collectible, although in fact, by reason of circumstances subsequently arising, nothing was ever collected upon it. On the other hand, a note may on that date have been such as to warrant the court in finding it could not then reasonably be considered a collectible note, in spite of the fact that subsequently the Trust

& Savings Bank or its receiver, succeeded by suit, or as the result of bankruptcy proceedings, or by compromise with the debtor, or arrangement with another, collected something on it, or even by a long series of small payments, managed to finally collect it in whole or in part from the debtor himself. In any one of the latter circumstances, I am of the opinion that the subsequent payments or collections on the note are not such as to warrant giving the note value to the bank for banking purposes on October 21, 1912, to the extent of such payments or collections.

The difference between the interpretation of the decision of the Supreme Court by the majority and that which I feel obliged to place upon it is well illustrated by item 37 of Division XIII of Loans and Discounts, being the note of one Osburn indorsed by one McNichols. This was a demand note dated November 2, 1910. It was included among the assets of the National Bank on October 21, 1912, and passed, on that day, to the Trust & Savings Bank and remained in the latter bank until it suspended in June, 1914, when the note came into the possession of the receiver. The master gave that note its full face value as a part of the assets of the National Bank and the majority opinion affirms that finding. The record shows that during the time the note was in the bank repeated demands were made for payment of the note, but without result. It was finally collected by the receiver from the indorser in September, 1915. The majority opinion affirms the master's finding on this item, on the theory that the note must be held to have been a *collectible* note, within the meaning of that term as used by the Supreme Court in its opinion, because ultimately it was collected by the receiver. On the other hand, I feel obliged to dissent because, the fact that the receiver was finally able to collect the amount due on the note from the indorser in the fall of 1915, the note being a demand note carried by the bank from the

fall of 1910 until it suspended, does not show such circumstances as to warrant a finding that it was "collectible" on October 21, 1912. It certainly was not *then* collectible and was utterly worthless to the bank for banking purposes in lieu of cash and as a part of its capital and surplus.

In the course of his argument, counsel for the Central Trust Company contends that what is meant by "banking purposes" is not quite clear and it is urged that "it would seem that a note is worth for banking purposes, the same amount it is worth for any other purpose." In my opinion, that contention is wholly unsound. A note may be worth its face value to an individual looking for a long-term investment and yet be worthless to a bank for banking purposes. To make a note valuable to a bank for banking purposes it must be capable of rediscount. In effect, it must be as valuable to the bank for its purposes in running the bank as cash would be.

I concur in the decision of the court as announced in the foregoing majority opinion as to all items making up the liabilities of the La Salle National Bank on October 21, 1912, and also as to all items making up its assets, except those items of assets constituting its overdrafts and certain items included in its loans and discounts, to which specific reference is hereinafter made. There are a few items in which I concur, for reasons other than those given for the decision of the court on those items in the majority opinion, but I shall not prolong this opinion by referring to those items specifically.

In referring to those items of assets on which I do not agree with the decision of the court, as set forth in the majority opinion, I shall follow the classification there used and I shall not refer to the facts involved in the items, as they are fully set forth in the foregoing opinion of the court,—except in so far as it may

be necessary to refer to the facts in giving the reasons for my disagreement.

Those items on which I am obliged to dissent, are the following:

(Here follows a discussion of the items of assets as to which JUDGE THOMSON does not agree with the majority opinion.)

In my opinion, therefore, the total value which should be given the assets of the National Bank as of the date of the transfer of the bank to the Trust & Savings Bank is $3,280,060.33. As stated in the majority opinion, the liabilities of the National Bank as of that date have been found to be $3,352,580.39. I am therefore of the opinion that on October 21, 1912, the bank was, in fact, insolvent to the extent of $72,520.06, and, consequently, that the capital and surplus of the bank were wholly impaired and that the decree entered in this case should be to the effect that the Central Trust Company should pay to the receiver, representing the creditors of the bank, $1,250,000 with interest at 5 per cent from September 24, 1915, together with the further sum of $16,203.52, the receiver's costs in the trial court.

MR. JUSTICE TAYLOR concurring, save as to five items.

Vast as this record is, we have carefully and thoroughly examined the many congeries of facts that are therein presented for consideration. In reality it contains not one but many lawsuits.

The reasoning of the opinion of the Supreme Court shows that we were directed to find the financial condition of the National Bank as of October 21, 1912, so as to determine what loss, if any, the creditors of the Trust and Savings Bank may have suffered. In that opinion, Mr. Justice Dunn, applying appropriate, equitable principles, in predetermining, approximately at least, whether the evidence then before the Supreme Court justified a reversal and remandment, made a computation, and in doing so considered what had

504    APPELLATE COURTS OF ILLINOIS.

Chicago Title & Trust Co. v. Central Trust Co., 224 Ill. App. 474.

been collected since October 21, 1912, either by payment or compromise, as a credit to the Central Trust Company, and, therefore, as sufficient evidence of value as to those particular assets upon which payments had actually been made after October 21, 1912. We do but follow his reasoning and his example, as illustrated by his computations, in holding that what was actually paid after October 21, 1915, should be considered as a credit to the Central Trust Company. Further, wherever the evidence sufficiently proved that an item had value, it has been allowed according to that evidence and regardless of payment.

I concur in the majority opinion except as to three items of assets and two of liabilities.

(Here follows a discussion of the five items, which is omitted by direction of the court.)

In my opinion the assets of the National Bank on October 21, 1912, which are fixed in the majority opinion in the sum of $3,865,359.85 should be increased by $101,760.62, which latter figure is the aggregate of the David Davis, Topeka Milling Company and Good-will items. The total assets then become $3,967,120.47. In my opinion the liabilities of the National Bank on October 21, 1912, fixed in the majority opinion at $3,352,580.39, should be decreased by the amount of the taxes, $6,000, and the difference between $53,250 and $21,202.02, the liability to nonconsenting stockholders. The total liabilities of the National Bank on October 21, 1912, then become $3,314,532.41.

Subtracting the liabilities, $3,314,532.41 from the assets, $3,967,120.47, gives, as the value of the assets of the National Bank on October 21, 1912, over and above all its liabilities, the sum of $652,588.06. The impairment of the capital stock and surplus of the National Bank on October 21, 1912, would, therefore, be the difference between $652,588.06 and $1,250,000, which is $597,411.94, for which latter sum together with interest thereon at 5 per cent per annum from

September 24, 1915, to this date, the Central Trust Company would be liable.