Benjamin Harris and Company, Appellee, v. Western Smelting and Refining Company and Bekins Van and Storage Company, Appellants. Mitchell-Jackson, Inc., Appellee.

Gen. No. 41,812.

456

Opinion filed March 18, 1942.

LEDERER, LIVINGSTON, KAHN & ADSIT, of Chicago, for appellants; SIGMUND LIVINGSTON, of Chicago, of counsel.

SIDNEY J. & ARTHUR WOLF and J. ROBERT COHLER, all of Chicago, for appellee Benjamin Harris & Co.; SIDNEY J. WOLF, J. ROBERT COHLER and BERNARD K. SHAPIRO, all of Chicago, of counsel.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

On January 8, 1937, Benjamin Harris & Company, a corporation with its principal place of business at Chicago Heights, Illinois, filed an attachment suit in the municipal court of Chicago against the Western Smelting & Refining Company, a corporation, with its principal place of business at Omaha, Nebraska. Mitchell-Jackson, Inc., operating a warehouse at 1107 S. Washtenaw Ave., Chicago, was named as garnishee. The affidavit in attachment averred that the defendant was a nonresident. The claim was for $1,500. Plaintiff claimed that the defendant had breached an agreement to sell a carload of mixed brass, located at the Mitchell-Jackson warehouse in Chicago. The garnishee answered the interrogatories, admitting that it possessed the carload of brass and denying that the brass belonged to defendant. On February 10, 1937, Melvin Bekins filed an intervening petition on behalf of Bekins Van & Storage Company. Melvin Bekins is the proprietor of a van and storage business at Omaha, Nebraska, operating under the name of Bekins Van & Storage Company. Bekins alleged that on or about April 5, 1934, he caused the carload of brass to be delivered to the Mitchell-Jackson warehouse, and received warehouse receipt No. 587; that the merchan-

dise since that time remained in the warehouse; that he retained the receipt; that the defendant, Western Smelting & Refining Company, desiring to purchase the carload of metal as the agent and representative of plaintiff, instructed him, Bekins, to draw a draft against plaintiff on the Northern Trust Company of Chicago for the sum of $5,625, and to forward the warehouse receipt to the bank with instructions to deliver it to plaintiff upon payment of the draft; that the draft was not paid by plaintiff; that the draft and warehouse receipt were returned to him, Bekins, on December 15, 1936; that under the Uniform Warehouse Statute, no attachment could lie against the merchandise while in the possession of the warehouseman unless the receipt were surrendered, or its negotiation enjoined, neither of which conditions had occurred; that he possessed the warehouse receipt and was the owner of the merchandise; that he never had any contractual relationship with plaintiff; and he asked that the attachment be quashed and that judgment be entered in his favor. The answer to the statement of claim filed by the warehouseman stated that the carload of brass was placed with it for storage on May 5, 1934 by the Bekins Van & Storage Company, a corporation of Omaha; that the merchandise was not subject to attachment for the reason that the receipt had not been surrendered; that it had no dealings with defendant and that it was advised that the original warehouse receipt was still in the possession of the Bekins Van & Storage Company. On April 8, 1937, plaintiff was given leave to amend the affidavit of attachment by increasing the amount claimed from $1,500 to $4,000. The amendment was made upon the face of the affidavit. No notice of the amendment was given to the defendant in attachment, nor was there any service by publication. The court heard the case without a jury, and on April 13, 1937, entered a judgment against the defendant in the sum of $3,750. As between the inter-

venor Bekins and the plaintiff, the court found the issues in favor of plaintiff. The court found that the brass was the property of the defendant and entered judgment against one carload of mixed brass in the possession of the garnishee. It directed that the garnishee deliver the brass to the bailiff on special execution; that the bailiff, out of the proceeds of the sale, pay the garnishee its storage charges, plaintiff the sum of $3,750, plus costs and interest, and that the balance if any be paid to the defendant. The intervenor appealed, and in an opinion filed in this court on March 16, 1938, the judgment was affirmed. (294 Ill. App. 610 (Abst.)) The intervenor petitioned the Supreme Court for leave to appeal from the judgment of the Appellate Court. The petition was denied. On July 19, 1938, more than a year after the entry of the judgment, defendant and intervenor filed a petition in the municipal court under section 21 of the act governing that court. At the same time defendant filed a limited appearance. The petition attacked the jurisdiction of the court to enter the judgment in attachment because of the failure of plaintiff to publish and give notice of the raising of the claim for damages from $1,500 to $4,000. The petition also urged other propositions. On November 4, 1938, defendant and intervenor filed an amendment to their petition, pursuant to leave of court. Plaintiff answered the petition and the amendment. On the trial of the issues raised by the petition, the amendment and the answer, the court denied the prayer of the petition and the amendment. Petitioners appealed. We reversed the order of the municipal court of Chicago and remanded the cause with directions to allow the prayer of the petition. (*Western Smelting & Refining Co. v. Benjamin Harris & Co.*, 302 Ill. App. 535.) The case was redocketed and service by publication was made on defendant, which appeared generally and filed its answer on September 5, 1940. The case was then tried

before the court without a jury. While the case was on trial, plaintiff, over the objection of defendant and intervenor, was given leave to file an amendment to its statement of claim concerning the basis of its claim for damages. Defendant and intervenor also filed a motion to strike certain evidence relating to the damages, which motion was overruled. The court found the issues for the plaintiff, and on January 29, 1941, denied the prayer of the intervening petition, sustained the attachment, assessed damages against the defendant in the sum of $3,960.89, ordered general execution to issue on the judgment, ordered a special execution on one carload of mixed brass in possession of the garnishee, directed the garnishee to deliver the carload of brass to the bailiff on special execution; that out of the proceeds of sale the sum of $1,115.60, plus additional storage charges, if any, from February 5, 1941 to date of sale at the rate of $30 per month, be paid to garnishee; that the amount of the judgment, plus costs and interest be paid to plaintiff; that the balance, if any, be paid to defendant, and that warehouse receipt No. 587 (which had been impounded by the court), be delivered to the garnishee. Defendant and intervenor appealed from this judgment order. This is the third time the case has been before us.

Plaintiff, Benjamin Harris & Company is a corporation with its general offices at Chicago Heights, a suburb of Chicago. Plaintiff is engaged in the business of manufacturing, smelting and dealing in metals. Benjamin Harris had been president and a director since 1905. Oscar Harris is a salesman and buyer and has been with plaintiff for 30 years. Louis Goldman is a salesman and buyer for plaintiff. In the verified answer filed on September 5, 1940, by the Western Smelting & Refining Company, by Morton Alpirn, secretary, defendant "denies that it is a corporation." However, during the trial it was stipulated that the defendant is a Nebraska corporation. The Western

Smelting & Refining Company is located at Seventh and Douglas streets, Omaha, Nebraska. This concern is a smelter and dealer in metals. It smelts and refines white metal, but does not smelt or refine brass. A. B. Alpirn is president of defendant corporation and Morton Alpirn, his son, is secretary. He has been connected with defendant since 1921. Bekins Van & Storage Company, intervenor, is in the storage and van business in Omaha and Sioux City. The intervening petition filed in behalf of Bekins Van & Storage Company on February 10, 1937, was signed and verified by Melvin Bekins, "its duly authorized agent." In the petition filed by defendant and intervenor on July 19, 1938, the intervenor is described as a corporation organized under the laws of Nebraska. This petition recites that on February 10, 1937, a petition was filed in behalf of the intervenor "a corporation." In the last appeal we stated that this storage and van company was operated by Melvin Bekins, doing business as Bekins Van & Storage Company. In the last trial, however, Bekins, in answer to a question as to whether the Bekins Van & Storage Company was a corporation, said, "No." Asked whether he was the sole owner, he asked, "In Omaha?" Being informed that the interrogator referred to Omaha, he answered, "I am not, No, a partnership." Asked whether he was the one who filed the intervening petition, he answered, "Yes."

We find that the evidence shows that defendant purchased three carloads of scrap, including the carload of scrap brass involved in this case, from the Santa Fe Railroad Company in November 1933. This carload of scrap yellow brass was purchased for $4,751.19, and weighed 100,025 pounds. It was loaded into Santa Fe car 128300 at the Corwith Yard in the vicinity of Chicago on January 29, 1934. On that date the general purchasing agent of the railroad sent a letter from Chicago to the defendant at Omaha stating that the

carload of scrap brass had been loaded into the car in accordance with a letter from defendant of January 19, 1934. The general purchasing agent's letter enclosed a bill directed to defendant calling for payment of the sum of $4,751.19, and requesting that a certified check, together with shipping directions, be sent to R. D. Brown, Cashier of the Santa Fe Railroad at Chicago. On March 7, 1937, defendant sent a letter to Mr. Brown at Chicago, enclosing a check for $4,751.19 in payment for the carload of brass. The letter inviting attention to the fact that the check was not certified, suggested that Mr. Brown wire the First National Bank of Omaha, on which the check was drawn, and concludes by asking Mr. Brown to wire defendant when the railroad was ready to release the carload of brass so that the defendant could furnish "disposition." The check was received by Mr. Brown on March 8, 1934. A representative of the railroad telegraphed to the First National Bank of Omaha, asking if the bank would protect payment of the check. On the same day the bank telegraphed to the railroad representative at Chicago that it would pay the check if properly signed and indorsed. On March 9, 1934, Mr. Collins, a representative of the railroad, telegraphed the bank that the check was being deposited. On March 9, 1934, defendant telegraphed Mr. Brown of the Santa Fe Railroad to deliver the car of brass to the agent of the Pennsylvania Railroad at Chicago. On March 13, 1934, Mr. Collins wrote to the local agent at Chicago, inclosing a bill of lading covering the Santa Fe car loaded with scrap brass which was billed out of the Corwith Yard the previous day. The letter recites that the shipment is covered by a bill against defendant, which defendant had paid, and that defendant requested that the car be delivered to the agent of the Pennsylvania Railroad at Chicago. The letter concluded by directing the agent at Chicago to deliver the carload of brass to the Pennsylvania Railroad. The check

which paid for the carload of brass is dated March 7, 1934, and was drawn on the First National Bank of Omaha, payable to the Santa Fe Railroad, and signed by defendant by its president. This check was deposited by the railroad in the Continental Illinois National Bank & Trust Company of Chicago on March 9, 1934, and debited against the bank account of defendant in the First National Bank of Omaha, on March 10, 1934. On March 8, 1934, intervenor issued a check drawn on and payable to the First National Bank of Omaha in the sum of $4,751.19, being the same amount as the check which defendant sent to the Santa Fe Railroad in payment for the carload of brass. Both defendant and intervenor had an account with the First National Bank of Omaha. This check of the intervenor was deposited to the credit of defendant's account in that bank on March 10, 1934. It was credited to defendant's account and debited to intervenor's account on the same day the check which defendant paid for the carload of brass was debited against defendant's account. The vice president of the bank testified that the bank would not permit the deposit of intervenor's check to the credit of the account of defendant without the consent of intervenor. In answering a question as to whether he directed the First National Bank of Omaha to deposit the Bekins check for $4,751.19 to the credit of defendant, Morton Alpirn, its secretary, answered, "Evidently, Mr. Bekins told them. After all, I can't direct the bank what to do with somebody else's check. He would, of course, have to tell them what to do with it." On April 3, 1934, intervenor sent a letter to Thomas Waters, district freight agent of the Pennsylvania Railroad at Omaha, wherein he referred to a letter sent by him to Mr. Waters on March 15th. Intervenor directed Waters to place the Santa Fe car of "scrap copper" in the Mitchell-Jackson warehouse in Chicago and to secure a negotiable warehouse receipt. The

letter also informed Waters that the accrued charges on the car were to follow into the warehouse. This is the first writing in the record connecting the intervenor with the carload of brass, which intervenor's letter describes as a carload of copper. It would appear that following the turning over of the car from the Santa Fe to the Pennsylvania Railroad on March 14, 1934, pursuant to the instructions of defendant, intervenor began giving directions as to the disposition of the carload of scrap brass. The letter of March 15, 1934 from intervenor was not introduced. On April 3, 1934, Mr. Waters acknowledged to the intervenor the receipt of Pennsylvania Railroad bill of lading dated Chicago, March 14, 1934, covering Santa Fe car 128300. From this letter it would appear that the carload of scrap brass was received by the Pennsylvania Railroad at Chicago from the Santa Fe Railroad on March 14, 1934. We draw the inference that the Pennsylvania Railroad bill of lading was sent to defendant and was in turn delivered by defendant to intervenor. Intervenor received the Pennsylvania Railroad bill of lading on March 14 or March 15, 1934. Despite the turning over of the Pennsylvania Railroad bill of lading to intervenor, and the letter from intervenor to Mr. Waters of March 15, 1934, Mitchell-Jackson, Inc., the garnishee, wrote defendant on March 30, 1934:

"Referring to the phone conversation about your car of scrap metal, which is being held by the Penna R. R., wish to assure you that we are in a position to unload, store and reship your car and give you thoroughly efficient service. We regret we were unable to give you all of the accrued charges of the Penna R. R., we do know however that your car is being assessed $5.00 per day demurrage, and this has been going on for some time, unless you give prompt disposition, we are sure you can make a saving by having your car placed in our warehouse, they would not have recom-

mended us if they had not known we are thoroughly responsible. The expense for handling your merchandise in our warehouse is as follows: Labor—80c per hour per man. Space—up to 400 sq. ft. 10c per sq. ft. per mo. Maximum $30.00 per month. Over 400 sq. ft. 7½c per sq. ft. per mo. We shall appreciate a prompt reply from you, and we remain." From the garnishee's letter of March 30, 1934, it appears that a representative of defendant had a telephone conversation with a representative of the garnishee relative to the carload of scrap brass. At the time of such conversation the carload of brass was being held by the Pennsylvania Railroad, having been delivered to it by the Santa Fe Railroad. Evidently, the Pennsylvania Railroad recommended the Mitchell-Jackson warehouse to defendant. In the letter of March 30, 1934, the garnishee had the impression that the carload of brass was the property of defendant, as it referred to the car as "your" car. Apparently, the contents of garnishee's letter were communicated to the intervenor on or about April 3, 1934, at which time the latter sent a letter to the freight agent of the Pennsylvania Railroad at Omaha directing that the Santa Fe car be placed in garnishee's warehouse, that a negotiable warehouse receipt be obtained, and that the accrued charges follow into the warehouse. On April 16, 1934, Mr. Waters wrote to intervenor that pursuant to intervenor's request, the Pennsylvania Railroad delivered the carload of brass to garnishee's warehouse at Chicago, and enclosed negotiable warehouse receipt No. 587, issued by the garnishee and showing that the garnishee advanced the freight charges amounting to $158. The carload of brass was delivered by the Pennsylvania Railroad to the garnishee's warehouse in Chicago, on April 5, 1934. Negotiable warehouse receipt No. 587, issued by garnishee, acknowledges receipt on April 5, 1934, at garnishee's warehouse in Chicago, "to be delivered only on the written order of Bekins Van & Stor-

age Co.," of one carload of scrap brass in Santa Fe car 128300. The receipt shows that the storage rate is $30 per month and that the freight advanced is $158. The garnishee also issued what is known as a non-negotiable inbound tally sheet showing the receipt of the same carload on April 5, 1934, and showing the consignor as Pennsylvania Railroad and the consignee as Bekins Van & Storage Company. On May 5, 1934, the garnishee sent a bill to intervenor. This bill shows intervenor indebted to the garnishee in the sum of $30 for storage space from April 5 to May 5, 1934; $30 for storage space from May 5 to June 5, 1934; $112 for 140 hours of labor in unloading the brass from Santa Fe car 128300; 50c for the issuance of warehouse receipt No. 587; $158 for freight charges advanced by garnishee to the Pennsylvania Railroad, and 10c for expense of paying freight charges, or a total of $330.60. Despite the fact that the warehouse receipt was in the name of intervenor, on February 24, 1936, defendant addressed a letter to garnishee reading:

"We would appreciate it if you would kindly allow F. Kramer Company's representative of Chicago to inspect the carload of brass we have stored in your warehouse." It will be observed that the defendant referred to the brass as the carload "we have stored in your warehouse." The ledger sheets of intervenor show a running account with defendant. This account shows that intervenor charged defendant with the following items in connection with the carload of brass: March 8, 1934, check No. 8645 to First National Bank of Omaha for $4,751.10; August 24, 1934, check No. 432 to Mitchell-Jackson, Inc. for $200; January 18, 1935, check No. 2141 to Mitchell-Jackson, Inc. for $200; September 28, 1935, check No. 5686 to Mitchell-Jackson, Inc, for $200; July 20, 1936, check No. 276 to Mitchell-Jackson, Inc. for $300; February 13, 1937, check No. 4015 to Mitchell-Jackson, Inc. for $100; April 23, 1937,

check No. 5286 to Mitchell-Jackson, Inc. for $300; April 26, 1937, check No. 5361 to Melvin Bekins for his trip to Chicago, $34.91; May 4, 1937, check No. 5476 to I. K. Goodman for $300; May 26, 1937, check No. 5935 to Mitchell-Jackson, Inc, for $500; June 25, 1937, check No. 6520 to I. K. Goodman for $150; and July 9, 1937, check No. 6714 to I. K. Goodman for $100. Intervenor's ledger shows that the $4,751.19 with which intervenor contends he purchased the carload of brass in March, 1934, was in reality charged on intervenor's books as a debit against defendant. Likewise, all payments on account of storage and other charges made to garnishee on account of the scrap brass, were in turn charged against defendant on the books of intervenor. I. K. Goodman is a Chicago attorney who represented the intervenor in the first trial and in the first appeal to this court. It is interesting to note that the fees paid to him by intervenor were in turn charged by intervenor against defendant. The first trial started on April 8, 1937. Melvin Bekins testified for the intervenor. The intervenor charged defendant $34.91 for Bekins' trip to Chicago. J. S. Jackson, president of the garnishee, testified that on March 30, 1934 he had a telephone conversation with someone connected with defendant, and that this was the telephone conversation referred to in his letter of that date. He also testified that the garnishee gave $500 to attorney I. K. Goodman at the request of the intervenor and that later on the intervenor reimbursed the garnishee.

On November 21, 1936, defendant from Omaha wrote plaintiff at Chicago Heights as follows:

"You no doubt are familiar with the 100,000 pounds of railroad brass we have located at the Mitchell-Jackson Warehouse in Chicago. We are contemplating selling this material this coming week and if you have not already inspected same, we would appreciate it if you would do so and quote us your best price for

immediate shipment. We realize that owing to the fact this is railroad material it may not be all the same grade. There may be one higher grade and a little lower grade. However, the writer would entertain a proposition of a minimum and maximum price. No exact price will be determined until after the material is taken to your plant and sorted. However, we would want a guaranteed minimum price. I think this is a fair way to handle same and as the writer knows you personally, he would be willing to accept your grading as I feel you would give us a square deal, as I am sure this material will run better than it may appear on the surface." Benjamin Harris, president of plaintiff corporation, went to the warehouse and looked at the scrap brass. On November 30, 1936, Louis Goldman, buyer for plaintiff, was in defendant's offices in Omaha and called plaintiff at Chicago Heights on the telephone. Morton Alpirn, secretary of defendant, took the telephone. Plaintiff agreed to purchase the carload of mixed brass at 6¼c a pound. On November 30, 1936, defendant, by M. Alpirn, sent plaintiff a letter reading:

"This is to confirm sale made to Benjamin Harris Company, Chicago Heights, Illinois, through your Mr. Goldman, one carload of mixed brass, located at the Mitchell-Jackson warehouse in Chicago at the price of 6¼c per pound, f.o.b. Chicago Heights, Illinois, terms 90%." This letter was received by plaintiff on December 1, 1936. On that day plaintiff wrote defendant:

"We beg to acknowledge receipt of your letter of the 30th inst. confirming your sale to our Mr. Goldman and accept our thanks for favoring us in this instance." On December 10, 1936, plaintiff received an invoice on the billhead of A. B. Alpirn, Omaha, Nebr., acknowledging receipt of the order for the 100,025 pounds of mixed brass at 6¼c a pound, f.o.b. Chicago Heights, Illinois, and "shipped" to plaintiffs at Chi-

cago Heights, Illinois. A. B. Alpirn was president of defendant corporation and did business from the same location as defendant. On December 7, 1936, intervenor wrote plaintiff as follows:

"We are today releasing to you Warehouse receipt No. 587 covering one carload of Scrap Copper stored at Mitchell-Jackson, Inc. We are drawing a draft on you for $5625 through the Northern Trust Co. Chicago, Illinois. Will you please call there, arrange for payment and receive this Warehouse Receipt? P. S. The above draft is on a 90% basis. When the car is completely settled, please remit the remaining 10% directly to us." This letter was received at Chicago Heights by plaintiff on December 8, 1936. The draft and warehouse receipt were forwarded to the Northern Trust Company of Chicago. On December 8, 1936, the Northern Trust Company sent a notice to plaintiff that the bank was holding for collection a draft with the warehouse receipt attached, calling for the payment of $5,625, plus $6.52 charges, and requesting payment at the bank on December 9, 1936. On December 8, 1936, plaintiff wrote intervenor at Omaha:

"We beg to acknowledge receipt your favor of the 7th and note your remarks regarding warehouse receipt for lot of Scrap Metals now stored at the Mitchell-Jackson Inc. warehouse. Our understanding with Mr. Alpirn was to the effect that the material was to be loaded and shipped sight draft, for 90% of the value, bill of lading attached, to Chicago Heights; however, we will be very pleased to take care of the draft as you have made it, with the understanding that there are no encumbrances against this Scrap and that all the storage charges will be paid by you. Promptly upon receipt of this information from you we will take care of your draft." On December 10, 1936, intervenor telegraphed plaintiff: "Reletter storage charges will be paid by us direct to Mitchell." The telegram was read to plaintiff over the telephone on receipt by

the telegraph office at Chicago Heights the afternoon of December 10, 1936. On December 12, 1936, plaintiff wrote intervenor:

"We communicated today with the Mitchell-Jackson Warehouse and they advised us that the storage charges on the Scrap which we purchased has not been paid. We wish to have advice that it has been paid before we pay your draft." At 9:16 a.m. on December 14, 1936, intervenor telegraphed plaintiff: "Our draft has been reduced by balance Mitchell charges. Please pay today." On the same day at 2:07 p.m. defendant telegraphed plaintiff: "Airmail check today. Five Hundred dollars. Car brass warehouse. Important." This telegram was received by plaintiff at 2:19 p.m., December 14, 1936. On receipt of defendant's telegram on December 14, 1936, plaintiff wrote defendant:

"Your telegram even date received. In reply advise that we cannot make any advance payments against the shipment of brass from the warehouse here. We have not yet received the brass and as soon as it comes in we will send you whatever differences there are due. In the meantime, we would like to have an invoice from either you or the Bekins Van & Storage Company. They have drawn on us and we believe it is necessary for us to know who is to receive all the monies covering the transaction. Regretting our inability to help you in this instance, we remain." At the time intervenor telegraphed plaintiff that the draft had been reduced, the bank was likewise instructed and the bank reduced the draft from $5,625 to $5,264. The telegram notifying plaintiff that the draft had been reduced was received by plaintiff at 10:12 a.m. on December 14, 1936. On December 14, 1936, defendant wrote plaintiff:

"Mr. Bekins called the writer this afternoon, and advised me that the draft was not paid after being there a week. He raised the devil about it as he didn't want to sell your company this brass, owing to the trouble we had several years ago. I explained to him

that this car was sold As Is no reductions regardless of how the brass turned out. He then said well if he pays the draft in full right away it would be satisfactory. Then he showed me a letter from your firm this afternoon signed by N. Harris saying you would not pay the draft as is, because the charges were not paid, altho there was a balance left after deducting for the draft of $600.00. He has notified both the bank and the warehouse not to deliver the draft or the material. I regret this deal turned out this way, however it was all your own fault. If you had told me in advance you were short of money, I may have been able to delay it however I doubt it.'' On December 14, 1936, intervenor telegraphed garnishee: ''Deal with Benj Harris Company cancelled. Don't deliver without authority.'' This telegram has a notation that it was delivered in Chicago at 7:30 a.m. Another notation indicates that it was sent from Omaha at 9:23 p.m. on December 14, 1936. We assume that it was received in Chicago on the morning of December 15, 1936. Morton Alpirn, secretary to defendant, was interrogated as to a conversation with Mr. Bekins on the afternoon of December 14, 1936, as mentioned in the letter of that date from defendant to plaintiff. Alpirn answered that he did not recall that on December 14, 1936 Bekins told him that he had notified the bank and warehouse not to deliver the draft or the material; that evidently Bekins had told witness (Alpirn) on the 14th that he was going to do it because witness wrote the letter on the 14th and the bank says Bekins notified the bank on the 15th. At 8:30 a.m. December 15, 1936, Bekins telephoned the bank to inquire whether the draft had been paid, and on learning that it had not been paid he directed the bank to return the draft and warehouse receipt. The draft and warehouse receipt were returned to the intervenor. On December 15, 1936, approximately between 2:15 and 2:20 in the afternoon, which was after banking hours, Attorney Leo Wolfsohn, accompanied by Jerome Harris, an employee of plaintiff, called at

the collection window of the Northern Trust Company. He presented to the teller a certified check dated December 15, 1936, drawn by plaintiff on the Continental Illinois Bank & Trust Company of Chicago, payable to the Northern Trust Company, in the sum of $5,269.25. Mr. Harris asked for delivery of the warehouse receipt which was attached to the draft sent by intervenor, and was informed that the draft and warehouse receipt had been returned to the sender that morning. Mr. Wolfsohn testified that on other matters he was able to do business with banks after 2 o'clock and sometimes as late as 3 o'clock, and that generally for receipts and pay-outs the closing time is 2 o'clock. It was stipulated that if Einer Klint were present, he would testify that he was employed in the collection department of the Northern Trust Company on December 15, 1936; that he received a long distance call from Mr. Bekins on that morning; that when the representative of plaintiff appeared in the afternoon he notified him that the draft and warehouse receipt had been sent back; that the official closing hour of the bank was 2 o'clock with the exception of the trust department; that payments are made after 2 o'clock and that the bank accepts them. On the afternoon of December 15, 1936, plaintiff having learned that the draft and warehouse receipt had been returned to intervenor, Oscar Harris, in behalf of plaintiff, called up Mr. Bekins at Omaha on the long distance telephone. He testified that he asked Bekins why the draft was recalled, and that Bekins answered, "Well, we have nothing to do with that brass. All we did was put it in, we put the receipt in our name. The material belongs to the Western Smelting & Refining Company." Bekins testified. "I don't know whether Oscar Harris telephoned to me about December 15, 1936." He denied having the conversation recounted by Oscar Harris. He further testified, "I am not to be understood to say I did not have a telephone conversation with

Oscar Harris on December 15, 1936, because I don't know who I might have had a conversation with. I remember having a long distance call, but I don't know who it was that called or what he said his name was. I don't know if it was from Benjamin Harris and Company. I don't recall having a telephone call specifically with anybody from Benjamin Harris Company. I would not say that I didn't. I just don't remember specifically. I have a recollection of a telephone call. I would be inclined to think it was in connection with this car of brass. In that conversation I did not say to whoever called, whether it was Harris or somebody else, that I had nothing to do with this brass, that that was the Western Smelting & Refining Company and that they ordered the return of the draft that it was theirs nor that in substance." On December 16, 1936, intervenor sent a letter to garnishee reading:

"Apparently our deal with the Benjamin Harris Company is off. They have not as yet picked up the draft and taken delivery of the Warehouse Receipt, No. 587. We will notify you who the purchaser will be. In the meantime, no doubt, there will be two or three different dealers desirous of seeing the material." On December 23, 1936, defendant sent a letter to the Grand Haven Brass Foundry, Grand Haven, Mich., reading, in part:

"For your information we have 100,000 pounds of yellow brass and railroad brass stored at the Mitchell-Jackson Warehouse in Chicago. We are wondering if you have occasion to have one of your representatives to be in Chicago within the next few days, and you could have him inspect this material, and advise what you can pay for this entire lot. There is about three different grades in this lot." On January 20, 1937, intervenor wrote to the attorney for plaintiff:

"Your letter of January 14th raises a question in our mind and we are wondering how you can purchase

our property from anyone else other than ourselves. We have at no time consummated a sale of the warehouse receipt covering our carload of metal. If your client, Benj. Harris is interested in the purchase of this carload, we would be pleased to receive his offer. Current quotations approximate 12¾¢ per pound.'' On January 9, 1937, intervenor wrote the following letter to granishee:

''It has come to our attention that when a certain metal dealer requested the weight of the metal you have in storage under the receipt we hold, No. 587, that you stated you had no idea as to the weight. May we suggest that you secure a copy of the original expense bill covering this carload from the delivering railroad. Our records show that this carload had 100,025# of scrap copper for remelting purposes. Would you please have this matter checked so that you can supply the weight authoritatively?'' On March 5, 1937, A. B. Alpirn, on his individual letterhead, wrote a letter from Omaha, to the Chicago Extruded Metal Company of Cicero, Illinois, reading:

''If you are interested, kindly quote us a price on approximately 100,000 pounds of brass material that is located in the Mitchell-Jackson Warehouse, Chicago, which can be inspected if you desire.''

In the first trial the defendant did not file an appearance. After the court entered judgment for plaintiff, the intervenor raised propositions as to the jurisdiction of the court, which were later raised by the defendant in the second appeal. It is interesting to note that Morton Alpirn, secretary of defendant, testified that he retained I. K. Goodman who represented him in the first suit, and that Goodman told him he ''would let me go by default because Mr. Bekins owned the merchandise.'' He further testified that Goodman told him that ''there is no reason for you to even appear in court.'' Alpirn testified that he paid Goodman $50 for legal advice, but that he did not pay

any part of the expense of the attachment suit; that the $50 paid Goodman was paid before the return day of the original attachment suit; that it was paid in connection with the attachment suit. While Alpirn spoke about himself as an individual, it was plain that he intended to convey the meaning that he was paying $50 to Mr. Goodman in behalf of the defendant. This testimony is illuminating and shows that the defendant took more than a casual interest in the first trial.

Defendant urges that delivery and payment of the purchase price are concurrent conditions, and that payment or tender of payment on December 14, 1936, was a condition precedent for the maintenance of the action. Defendant insists that there is no evidence as to the reason for the failure to pay the draft on December 14, 1936; that the evidence does not disclose why the plaintiff waited until after banking hours on the following day to go to the bank to tender payment, and that plaintiff made no showing that it had the money ready to pay on the 14th or at any time prior to 2 p.m. on December 15th. Defendant points out that the draft and warehouse receipt were at the bank until the morning of December 15th, and that the plaintiff could have tendered payment to the bank on December 8th, or on any subsequent date until the draft was returned. Defendant calls attention to the fact that under the contract plaintiff was withholding 10 per cent of the purchase price to cover discrepancies in weight; that there was no dispute as to the weight of the metal and that hence plaintiff was amply protected against the charges, and states that upon the receipt of intervenor's telegram at 10:12 a.m. on December 14th, plaintiff took no action; that it did not reply to the telegram, nor did it telegraph the defendant or intervenor that payment would be made on that day or the following day. Defendant cites cases in support of the proposition that the acts of delivery and payment are to be performed concurrently, and that

as the act of payment is in its nature capable of being done instantly, the rule as to reasonable time does not apply. Plaintiff answers these contentions by asserting that under the terms of the contract the buyer was not required to tender the purchase price until the brass was delivered f.o.b. Chicago Heights; that when time for delivery is not fixed by the contract, the buyer is entitled to a reasonable time after receiving notice to procure cash or certified check, and that in any event plaintiff was not required to tender the purchase price because of defendant's prior repudiation and because of the conflicting demands for payment of the purchase price. The parties understood that the brass was located in garnishee's warehouse in Chicago. It was purchased at $6\frac{1}{4}$¢ per pound, ''F.o.b. Chicago Heights, term 90%.'' Hence, plaintiff was to pay defendant 90 per cent of the purchase price at the time of delivery at Chicago Heights, the remaining 10 per cent to be paid after delivery to plaintiff on verification of the weight. The freight charges for the movement to Chicago Heights, were to be paid by defendant. Apparently, defendant informed intervenor of the deal. Accordingly, on December 7, 1936, intervenor wrote a letter to plaintiff stating that a draft in the sum of $5,625 was being drawn on plaintiff for payment through the Northern Trust Company of Chicago, which draft was on a 90 per cent basis. The letter also requested that the remaining 10 per cent be remitted directly to intervenor. On December 8, 1936, plaintiff wrote intervenor that its understanding with Mr. Alpirn was that the brass was to be loaded and shipped sight draft for 90 per cent of the value, ''bill of lading attached, to Chicago Heights; however, we will be very pleased to take care of the draft as you have made it with the understanding that there are no encumbrances against the scrap and that all the storage charges will be paid by you. Promptly upon receipt of this information from you, we will take

care of your draft." It will be observed that in this letter plaintiff did not offer to pay the charges to the garnishee. It is apparent that plaintiff knew that the garnishee had charges against the brass. There was no obligation on the part of plaintiff to pay these charges or to negotiate with the garnishee. It was the duty of the defendant not only to pay the charges but to load the brass on a car and deliver it f.o.b. Chicago Heights. In its letter of December 8, 1936, plaintiff expressed a willingness to take care of the draft as it was made with the understanding that there would be no encumbrances against the brass. On December 10, 1936, intervenor telegraphed plaintiff that the storage charges would be paid by it direct to garnishee. Defendant did not pay the storage charges to the garnishee. Not having heard, plaintiff inquired of the garnishee as to whether the storage charges were paid, and on December 12, 1936 wrote intervenor that they had communicated with the warehouse and were advised that the storage charges on the brass had not been paid, and that plaintiff desired to have advice that such charges had been paid before the draft would be paid. On December 14, 1936, intervenor wired plaintiff that the draft had been reduced to the extent of the indebtedness to the garnishee. However, on the same day plaintiff received a telegram from the defendant asking for a check for $500 by air mail. On receipt of this telegram plaintiff wrote to defendant asking for an invoice from either defendant or intervenor, stating that intervenor had drawn on plaintiff and that plaintiff would like to know who was to receive the money in the transaction. This inquiry by plaintiff was natural and one that would be made by any business man in order to protect himself against conflicting claims. It will be recalled that on December 10, 1936, plaintiff received an invoice from A. B. Alpirn as an individual. It is interesting to note that on December 14, 1936, intervenor sent a telegram to the garn-

ishee stating that the deal was canceled and not to deliver the brass. This telegram was confirmed by a letter on December 16, 1936. On December 14, 1936 defendant sent a letter to plaintiff which indicated that Mr. Alpirn and Mr. Bekins had a conversation on the afternoon of December 14th, and that Bekins had notified the bank and the warehouse not to deliver the draft or material. Morton Alpirn testified that he had a conversation with Bekins on December 14th. It is clear that the decision to recall the draft and warehouse receipt was arrived at on the afternoon of December 14, 1936. At 8:00 a.m. on December 15, 1936 Bekins telephoned to the Northern Trust Company, directing that bank to return the draft and warehouse receipt, which was done. While it is true that plaintiff's representative did not appear at the bank with a certified check to pay the draft until about 2:15 p.m. on December 15th, had such representative appeared at any time after the telephone conversation between Bekins and the employee of the bank at 8:00 a.m. that morning, plaintiff would not have been permitted to pay the draft. So far as the defendant and the intervenor are concerned, the deal was called off on the afternoon of December 14, 1936. Bekins testified that the reason he called the bank by long distance telephone on the morning of December 15th, was that the evening paper of December 14th, showed an increase in the price of copper, the principal ingredient of brass. In our opinion the mere statement of the facts clearly establishes that plaintiff was ready, able and willing to pay the purchase price and was prevented from doing so by the action of the intervenor and defendant in causing the return of the draft and warehouse receipt. In view of the dispute as to whether the brass was the property of the intervenor or the defendant, plaintiff was justified in exercising caution. Plaintiff acted reasonably in endeavoring to ascertain whether the purchase price should be paid

to the intervenor, A. B. Alpirn, or to the defendant. Plaintiff's letters of December 8, and December 12, 1936, addressed to intervenor, show clearly that it was anxious to consummate the deal, and that it was taking the initiative in urging payment of the storage charges due to the garnishee. Neither defendant nor the intervenor paid the storage charges. Plaintiff waived that part of the contract which required delivery f.o.b. Chicago Heights on condition that there would be no encumbrances against the brass. Defendant did not take any steps to pay the storage charges and it was necessary for plaintiff to again write intervenor on December 12, 1936. The intervenor did not then pay the storage charges, but reduced the draft to an amount which he estimated would equal the sum of 90 per cent of the purchase price, after allowing plaintiff the amount of the storage charges. This was not a compliance with the condition set out in plaintiff's letter of December 8, 1936. For this reason also defendant was in default in performing its part of the contract. The fact that plaintiff was willing to waive the clause requiring delivery f.o.b. Chicago Heights shows how anxious plaintiff was to consummate the deal. In our opinion the mere statement of the facts clearly establishes that plaintiff was ready, able and willing to pay the purchase price and was prevented from so doing by the untimely withdrawal of the draft and warehouse receipt, and by the confusing relationship of defendant and intervenor.

The second point presented by defendant is that where recovery is based upon the difference between the contract price and the cost of the nearest substitute for the goods purchased, the goods must have been actually bought by the plaintiff, and that the proper measure of damages is the difference between the contract price and the market price on the day when delivery should have been made. Defendant maintains that the evidence shows that the market

price advanced a quarter of a cent per pound on December 15, 1936, or $5 a ton, and that the damages at the outside should not exceed $250. Plaintiff declares that the damages were conclusively established by evidence and that the correct measure of damages in the absence of a market price for the goods contracted for is the difference between the contract price and the cost of the constituent elements without regard to whether or not plaintiff actually purchased such elements. The evidence shows that the defendant knew that plaintiff was engaged in the smelting business, and also knew that the brass was to be used for the purpose of making ingots. We find that the evidence shows that the brass purchased, known as Santa Fe brass, contained 72 per cent copper, 4 per cent tin, 7 or 8 per cent lead, and the balance zinc. There was evidence that the brass contained a small percentage of antimony and some impurities. There was competent testimony which warranted the court in finding that it was practically impossible on December 15, 1936, or thereafter during that month to purchase scrap brass on the market anywhere in the United States; that any quotations were purely theoretical because no purchases could in fact be made. There was testimony that the shortage was the result of a fear of inflation, and a sudden business impetus caused by large purchases by factories which had theretofore pursued a hand to mouth purchasing policy and were then acquiring large inventories, and by the substantial rises in copper prices which caused purchasers to flock to the market to try to cover. Qualified witnesses testified that brass might have been purchased at a price of 4 or 5c more per pound than the theoretical market quotation. The evidence further shows that when such a shortage arises in the smelting business, the smelter must necessarily purchase the constituent elements of the scrap brass in order to make up the brass ingots. In computing plaintiff's dam-

ages, the witnesses all considered the type of scrap
brass covered by the contract and the recognized
constituent elements of such brass. In testifying as
to the market price of such constituent elements, these
witnesses all used the cheapest type of ingredients
and followed the same procedure which they custom-
arily followed in their actual business practice. Thus
they used scrap copper in arriving at the market price
of copper and not new copper, and scrap lead and
not new lead. They used new tin because that was
the only tin available at the time, and the new zinc
because scrap zinc contains impurities. There was
testimony that the zinc in the type of brass covered
by the contract did not contain the impurities that
zinc itself has. Benjamin Harris testified that he
telephoned numerous large dealers throughout the
United States in an attempt to make purchases of
scrap brass on December 15th, and thereafter during
the same month. Other witnesses testified to the same
effect. All attempts were met by the refusal of
holders of scrap brass to sell. On January 20, 1937,
intervenor wrote to the attorneys for plaintiff that if
Benjamin Harris was interested in the purchase of
the carload of brass, intervenor would be pleased to
receive his offer, and that "current quotations ap-
proximate 12¾c per pound." Hence, on Bekins' ad-
mission, the same scrap brass was worth 6½c per
pound more than the contract price within a month
and five days after the contract was broken by defend-
ant, or $6,500. Defendant relied upon quotations in
trade publications. Three expert witnesses testified
that the smelters do not use the quotations contained
in these papers on scrap brass, but only use the quota-
tions in such papers as to the basic metals. Defend-
ant calls attention to the testimony of Benjamin Har-
ris on the first trial that the market price of the brass
increased a quarter of a cent a pound on December 15,
1936. Having examined the record of the previous

trial and of the present trial, we are of the opinion
that he was testifying as to a purely theoretical mar-
ket price. He then testified that it was impossible to
buy scrap brass at that price. In the third trial he
testified that the price of 6½c a pound merely referred
to the price at which dealers were attempting to make
purchases and not the price at which scrap brass
could actually be bought. We agree with the asser-
tion of plaintiff that there must be a willing seller
as well as a willing buyer. While there is no evidence
that plaintiff actually purchased the constituent ele-
ments in place of the scrap brass covered by the con-
tract, the record does show that plaintiff carried on
an extensive smelting business amounting to twenty-
five to thirty million pounds per year. Obviously
plaintiff was required to use materials on hand as
well as basic elements derived from the scrap subse-
quently delivered to plaintiff in order to make up
the brass ingots in lieu of the materials which de-
fendant agreed to sell to plaintiff. The record also
shows that scrap copper, the most important element
of brass, was purchased by plaintiff during this pe-
riod. Plaintiff proved that the market value of scrap
copper on December 15, 1936, was 9c a pound, scrap
lead 4¾c a pound, tin 52c a pound and zinc 5½c a
pound. This makes $9.82 per 100 pounds for the in-
dividual metals that would take the place of the Santa
Fe brass which was purchased, or a total of $9,822.45.
The difference between this sum and the purchase
price was $3,300.89. Defendant supports its argu-
ment by citing *Tribune Co. v. Bradshaw,* 20 Ill. App.
17; *Coates v. Lake View Oil & Refining Co.,* 20 Cal.
App. (2d) 113, and 55 C. J. 1175. In the *Tribune* case
it appears that Hugh Bradshaw sued the Tribune
Company to recover damages for the breach of a con-
tract in relation to advertising. It was Bradshaw's
theory that the contract was made through an em-
ployee of the Tribune, named J. A. Crawford. This

court decided that Crawford was not an employee of the Tribune and that the Tribune did not subsequently ratify his activities. Although this finding by the Appellate Court disposed of the case, the opinion went on to discuss the question of damages. It was unnecessary to discuss the damages to be awarded, since the court first decided that Crawford was not entitled to recover anything. We regard the discussion as to damages as merely *dictum*. Furthermore, the rule as to damages laid down in the *Tribune* case is not applicable to the factual situation presented by the instant case. The general rule is that on a breach of contract to deliver goods the measure of damages is the loss sustained by the failure to perform the agreement. While this, like all other legal propositions is plain and simple, its practical application frequently becomes difficult and embarrassing. (*Deere v. Lewis,* 51 Ill. 254, 257.) The law of this State is that the vendee may recover as damages against the vendor the difference between the contract price and the market price, without making any purchases, the result being the same and the vendee being entitled to the benefit of his contract. (*Summers v. Hibbard, Spencer, Bartlett & Co.,* 153 Ill. 102.) In *Follansbee v. Adams,* 86 Ill. 13, 16, the court said:

"When appellee was notified, by the insolvency of appellant and by his request to settle the contract, of his inability to deliver the wheat in July, according to the terms of the contract, he did not buy 60,000 bushels of wheat of another and charge up the difference to appellant, as he might have done, but he called upon a broker on the Board of Trade to determine the then market price of wheat—or in other words, what the wheat would cost—and charged the difference between the contract price and what wheat was then worth to appellant. The result is the same, so far as appellant is concerned, as if appellee had bought in the market a like quantity of wheat." In

our opinion the rule applicable to the facts of this case is stated in 55 Corpus Juris, sec. 1149, page 1161:

"Where the goods have no market value, resort must be had to other elements of value, and the measure of damages has been held to be the difference between the agreed price and the reasonable or actual value of the goods, which value must be ascertained by the best evidence available. The value of goods may be determined by those experienced in the value of such goods, or by the advanced price at which the buyer had agreed to sell them, or the price at which the buyer had sold like goods just prior to the breach, and is sometimes ascertained by the proof of what it would cost the buyer, acting in good faith and with diligence, to procure, in the condition required by the contract and delivered at the place named for delivery, the kind of article or goods contracted for." In 2 Williston on Sales (2d) sec. 599h, page 1497, the doctrine of replacement is discussed. The author states that:

"In the typical case of a breach when, and not before, the defendant's entire performance was due, the plaintiff's direct damages are based on the value at that time of the performance which the defendant agreed to render. This will be true regardless of whether the plaintiff replaces the promised performance by going to the market or not. Replacement or opportunity of replacement in such a case may be evidence of value, but that is all." In the case of *E. W. Bliss Co. v. Buffalo Tin Can Co.*, 131 Fed. 51, 55, the court said:

"When an article has no market value, an investigation into the constituent elements of the cost to the party who is entitled to be furnished with it becomes necessary; and that, compared with the contract price, will afford the measure of damages." It is true that the facts in the *Bliss* case do not correspond at all with the facts in the instant case. However, we be-

lieve the principle there stated to be sound and applicable to the facts before us. In the instant case there was evidence to support the finding that there was no market price for scrap brass on or about December 15, 1936. Consequently, plaintiff had to establish its damages by showing the market value of the constituent elements of brass of the type purchased. We agree with plaintiff that the defendant has confused the rule we are discussing with the rule relating to the mitigation of damages. The only time a buyer is required to purchase a substitute is when he seeks to recover a loss of profits. In such case he must act with reasonable diligence and actually purchase the nearest substitute in order to minimize the damages. The purchase of a substitute would not be of any advantage to the defendant. Such purchase would be merely one way of establishing the value of goods contracted for. Another equally valid way to prove such value is by the testimony of witnesses. This was done and we are satisfied that the court did not commit error in arriving at the damages in that way. It must also be borne in mind that the defendant was fully conversant with the smelting business and with the market conditions. There was evidence that defendant was advised at the time of the purchase that the brass was to be used by plaintiff for the making of brass ingots. Nevertheless, on December 14, 1936, when the scarcity of brass became evident, the defendant breached its contract. Defendant could reasonably foresee every result which might follow its course of conduct. It knew the ingredients of brass were essential to plaintiff's business. Defendant maintains that speculative and uncertain damages cannot be recovered. The answer to this statement is that the damages allowed are not speculative or uncertain. Defendant also suggests that inflated speculative market prices, not the result of natural causes, but of artificial means to stimulate prices, cannot be a legitimate means of estimating just

compensation. There is no evidence that the market price of the constituent elements of brass was artificially stimulated. Defendant also urges that even assuming plaintiff could not buy other like scrap on the market, the scrap in question remained in the warehouse in Chicago and it was the duty of the plaintiff to offer to purchase the same from the intervenor at the best price available. The cases cited in support of this proposition only go so far as to hold that where the seller after a refusal to deliver the goods contracted for, offers to deliver them at a price cheaper than they can be obtained from others, the buyer under his duty to mitigate the damages, must accept such offer, provided that the offer is unconditional and does not involve the surrender or waiver of any right that the buyer may have. 55 C. J., 1173. Neither the intervenor or defendant offered to sell the brass to the plaintiff at a quarter of a cent rise. The letter from intervenor dated January 20, 1937 shows that it was holding the brass for 12¾c per pound. If damages were allowed on this basis it would result in a much larger judgment against the defendant. Mr. Bekins testified that he would have been willing to sell the brass after the breach for a price of a quarter of a cent higher than the contract price. This is a statement which he made at the trial as to his condition of mind at the time the contract was breached. There was no way for plaintiff to know what the intent of defendant or intervenor was without such parties giving forth some manifestation of such intent. This point is without merit.

The court found that the plaintiff's loss was $3,300.89 and allowed interest at the rate of 5 per cent per annum from the date of the breach until the day judgment was entered. This amounted to $660, and was included in the judgment. Defendant contends that the court erred in allowing interest. Plaintiff argues that as the contract was in writing and the

damages ascertainable by computation, interest was properly allowed. The case of *Sterling-Midland Coal Co. v. Great Lakes Coal & Coke Co.*, 266 Ill. App. 46, involved a claim, presented by setoff, the defendant suffering a loss of $3,909.92 because of a breach of contract of sale by plaintiff. Defendant contended that the plaintiff refused to deliver certain merchandise which the defendant was then compelled to purchase in the open market, paying therefor $3,909.92 more than the contract price. The trial court held that the damages were unliquidated and could not be set off. The Appellate Court affirmed the judgment. We stated the rule to be as follows:

"As we understand the statute in a case of this kind, the damages must be first liquidated, or, second, of such a nature as to be the subject of computation, otherwise interest thereon may not be allowed. The reason for the rule is that the opposite party, where the damages are neither liquidated nor subject to exact computation, is not able to ascertain the exact amount which is due and therefore is not able to make a tender of the same." In the instant case there is a dispute in the testimony as to the proportions of the various ingredients making up the scrap brass purchased by plaintiff. The trial court resolved this dispute in favor of plaintiff. We cannot hold that the damages were liquidated or that the same could be ascertained by simple and certain computation. We are of the opinion that the court should not have allowed interest from the date of the breach of the contract until judgment was entered. Plaintiff should have interest at the rate of 5 per cent per annum on the sum of $3,300.89 from the day judgment was entered.

Defendant maintains that on the former trial plaintiff claimed that there was a fixed market for the goods in question on December 15, 1936, and the days following up to the day of trial; that the statement of claim alleged as damages the increase in the fair cash

market price of the metal and the contract price; that in the judgment taken by default against defendant the damages were fixed supposedly at the difference in the market price and the contract price, and that in our opinion in the appeal from the first judgment we stated that the judgment was for the difference in the market price and the contract price. Defendant states that on the former trial Benjamin Harris, the only witness produced on the matter of damages, testified that the market price of the metal on the date for delivery had increased a quarter of a cent per pound, or $5 a ton. Defendant declares that at the last trial, plaintiff's theory was completely changed, that it asserted there was no market price for the metal on December 15, 1936, and that in order to fix the damages, the value of the substitutes was proven. Defendant states, and the record shows, that on the present trial the judgment was based upon the value of the constituent elements. Defendant asserts that these two positions are clearly inconsistent; that if there was a market price then, it was improper to prove the value of the substitutes, and that if there was no market price then the basis upon which the former judgment was rendered at the insistence of the plaintiff was false. During the last trial, plaintiff, over objection, was given leave to file an amendment to its statement of claim, asserting damages on the basis that there was no market price on the metal on December 15, 1936, and that plaintiff was entitled to recover damages according to the market value of the constituent elements. Defendant cites *Pennsylvania R. Co. v. John Anda Co.,* 131 Ill. App. 426; *Mahle v. Mahle,* 211 Ill. App. 622 (Abst.), and *Chicago Title & Trust Co. v. Central Trust Co.,* 224 Ill. App. 474, in support of its contention. During the trial defendant filed a written motion to strike out all of the evidence offered by plaintiff with reference to the fact that there was no market value for the brass in

question on December 15, 1936, or on the immediate
subsequent days, and also to strike out all evidence
attempting to prove the market price at that time of
the various ingredients necessary to make brass
ingots. Defendant supported its motion with a tran-
script of the testimony of Benjamin Harris, given on
the first trial. We have studied the record of the first
trial. The statement of claim asserted that "the mar-
ket price of said mixed brass has increased since plain-
tiff entered into the said contract with the defendant,
and the plaintiff claims $1,500 damages which it be-
lieves to be the fair and reasonable estimate of the
damages by it from the facts set forth." As we have
seen, plaintiff was given leave to increase the *ad
damnum* to $4,000. Defendant did not file an appear-
ance in the first case. Garnishee filed an answer and
the intervenor filed a petition. Benjamin Harris was
the only witness to testify on the proposition of dam-
ages. The attorney for plaintiff as well as the at-
torney for the garnishee and intervenor proceeded on
the erroneous theory that plaintiff was entitled to re-
cover the difference between the contract price and
the value at the time of trial. However, the attorney
for plaintiff asked the court to enter judgment for
"the gross amount of damages between December 15,
1936 and the time we filed suit," which was estimated
at $3,750, and the court did enter judgment for this
amount. Mr. Goodman, attorney for the intervenor,
did not raise any point on the damages. He urged
that his client was the owner of the brass. In the
first trial Harris testified that the market value of
the brass on December 15, 1936 was 6½c a pound, a
difference of a quarter of a cent a pound; that the
market on brass fluctuated each day after that; that
it advanced up to 10c a pound in December; that it
declined about a week before the trial; that the differ-
ence between 6¼c a pound and the market price on the
day he testified was 3½c a pound; that the copper

market as distinguished from the brass market, advanced from 9½c to 16c a pound; that on December 14, 1936 there was an advance of about $5 a ton. In answer to a question as to whether it was possible on December 15, 1936 to go out into the open market and purchase 100,000 pounds of brass of the type sold, witness answered, "It was impossible, it was very difficult." In answer to the question, "Did you try it?", he answered, "Yes; it was difficult to buy on that day on account of the market advancing on December 14, 1936 in the afternoon. For that reason there was no sellers." Answering as to how long a period of time it would take to accumulate 100,000 pounds of such brass, he said, "This grade of material is difficult to buy; I mean material exactly like they had at this storage company. The material I believe is railroad stuff and is not offered very often. As a matter of fact we have not been offered any since that time." He stated that they bought brass and copper every day. Answering a question as to what the market price was on January 8, 1937, the day suit was filed, he answered, "There was an advance of 2¾c per pound." He further testified that the market price on January 8, 1937 was 9c a pound. In the last trial, answering a question as to the brass market on December 15, 1936, Mr. Harris answered, "It was impossible to buy anything." He stated that he bought a small amount of brass; that "We ran into a runaway copper market at that time"; that there was no brass available. In answer to a question by the court, "Could it be bought at all at any price?", he answered, "It might be at 4 or 5c a pound or something like that." In answer to a further question by the court, "Then it was available but the price was high?", he answered, "It might be, Yes." Asked by the court, "Would you be able to say what the price was?", he answered, "No, there were no offers at all." Asked by the court, "There was no established price,

is that the point?'', he answered, ''No.'' In the last trial he further testified that he made an effort to buy brass on December 15, 1936; that he called up some of his customers in various places by long distance telephone; that he made an effort to buy brass on that day and days after that; that he called up Moskovitz Bros. in Cincinnati, Sanka-Galumbo in Kansas City and dealers in Chicago; that he kept after his men to try to ''pick up stuff at that time, but it was impossible''; that the men he called up on the telephone were large dealers. He testified, in the present trial, that at the first trial he answered about the market price advancing a quarter of a cent; that he had in mind that he tried to buy at an advance of a quarter cent more, but it was impossible to pick up any scrap. This record shows plainly that on the first trial the attorneys for plaintiff and intervenor were endeavoring to establish the market value of brass at the time the suit was filed on January 8, 1937, or at the time of the trial. A careful consideration of the testimony of Benjamin Harris at the first trial shows that he said it was impossible to purchase scrap brass on the market on December 15, 1936 and shortly thereafter. We have examined the brief filed on the first appeal by the attorney for the intervenor. This brief urged that there was a failure to prove the contract alleged in the statement of claim; that the warehouse receipt carried the title to the property; that there was no meeting of the minds of the parties; that the judgment rendered was for a greater amount than that which was specified in the affidavit; that the judgment was erroneous for that reason, and that the attachment bond was insufficient. It will be observed that in the first appeal the intervenor raised the proposition that the action of the court in rendering judgment for a greater amount than that specified in the original affidavit without publishing and giving notice to the defendant, was erroneous. The intervenor in the first

appeal did not, however, raise any question as to the damages. In the opinion on the first appeal we said: ''This suit was entered for an amount of damages which was the difference between the purchase price of the carload of brass, namely, 6¼c a pound, and the value of the brass during December, 1936, which was 10c a pound.'' In the first trial the theory of plaintiff, apparently not disputed by intervenor, was that the damages to be allowed should be the difference between the contract price and the market price at the time of filing suit or at the time of the trial. The law, however, is that the plaintiff is entitled to recover the difference between the contract price and the market value as of the time of the breach of contract. We have held that under the facts of this case the court had the right to award damages on the basis of the difference between the contract price and the market value of the constituent ingredients of brass of the type purchased as of the time of the breach of the contract. In the first trial the parties proceeded on an erroneous theory. There was evidence in that trial and also in the second trial that Benjamin Harris was referring to a theoretical market price when he was talking about a market price as of December 15, 1936, and that in fact brass of that type could not be purchased. We find that the cases cited by defendant are not applicable to the facts before us and that the plaintiff is not taking a position inconsistent with that taken by it in the first trial. In passing on the credibility of Benjamin Harris, the court had the right to take into consideration any contradictory testimony given by him on the first trial.

Intervenor contends that the facts do not prove a joint adventure or partnership, and that the fact that the warehouse receipt was issued to the intervenor, who paid the full purchase price for the scrap and that he had sole control and possession of such receipt, was a clear recognition by the defendant that the inter-

venor was the owner of the brass. In his oral opinion, the trial judge spoke about the intervenor and defendant being joint adventurers. Bekins testified that he was the owner of the brass. He is contradicted by his ledger sheets and other documentary evidence and by the testimony of disinterested witnesses. He testified that he paid a draft at the First National Bank of Omaha and received a bill of lading at that time. He denied that he bought the brass from the defendant and repeatedly stated that the defendant did not at any time own the brass. The evidence clearly shows that the defendant purchased the brass from the railroad. The records of the Omaha bank show that a check for $4,751.19 was deposited to the account of the defendant at that bank on March 10, 1934, and that there was a debit against Bekins' account on the same day for the same amount. It is clear to us that Bekins' check was deposited in defendant's account and with the consent of Bekins. On the same day there was a debit against defendant's account to cover the check issued by it to the Santa Fe Railroad in the sum of $4,751.19 to cover the purchase price of the brass. Oscar Harris testified that he had a telephone conversation with Bekins on December 15, 1936, and that Bekins stated he had nothing to do with the brass, that it belonged to the defendant, and that the warehouse receipt was put in his (Bekins) name for defendant. Bekins, although first denying that he had a telephone conversation relating to the brass on December 15, 1936, finally admitted that he recalled having had a conversation. He denied that he made any such statement as attributed to him by Harris. Mr. Goodman, the attorney for intervenor in the first trial, testified that Morton Alpirn called on him in his office in March or April 1938; that he, Goodman, told Alpirn that he, Alpirn, did not show any previous interest in the case; and that Alpirn then told Goodman that he was the one who was going to pay the money and that it was his merchandise. The

Omaha representative of the United States Fidelity & Guaranty Company testified that Morton Alpirn called at his office on July 16, 1940, and demanded damages on the attachment bond after the opinion in the second appeal had been filed. His testimony was that Alpirn claimed that his company was entitled to receive the damages. The ledger sheets of the intervenor show that all expenses in connection with the brass were charged to the defendant, including warehouse charges and attorney's fees involved in the attachment suit. Intervenor admitted that the defendant had offered the brass for sale to the plaintiff with the knowledge and consent of intervenor. It is clear that the intervenor allowed defendant to hold itself out as the owner of the brass. The testimony of the witnesses and the documentary evidence established that defendant was the owner of the brass. We agree with defendant that the evidence does not show a joint adventure. We think it is immaterial whether the parties were engaged in a joint adventure. In his oral opinion the trial judge said: "The Court further feels that the testimony of both Bekins and Alpirn is clouded in uncertainty to such an extent that the trial Court is forced to conclude that these two gentlemen even yet have not told the Court the true nature of their deal." This characterization of these witnesses is fully justified by the record.

Intervenor urges that if we decide that he is not the owner of the absolute title to the goods, then the only alternative would be that the transaction as a whole evidences a loan from him to defendant on security of the warehouse receipt for the amount of the purchase price, storage, freight and expense paid by Bekins and interest thereon. In the first trial and in the first appeal the theory was that it was the owner of the warehouse receipt; that it never parted with title thereto; that it never saw the offer to sell to plaintiff made by defendant; that defendant, Western Smelting

& Refining Company, desiring to purchase the brass as the agent and representative of plaintiff, Benjamin Harris & Company, instructed the intervenor to draw a draft against Benjamin Harris & Company on the Northern Trust Company of Chicago for $5,625 and to forward the warehouse receipt with advice to deliver the receipt to plaintiff upon payment of the sight draft. In the last trial, intervenor dropped the theory that the defendant, desiring to purchase the brass as the agent of plaintiff, instructed the intervenor to draw a draft against plaintiff on the Northern Trust Company. In this trial the intervenor recognized that it was fully acquainted with the deal whereby defendant was selling the brass to the plaintiff. In the last trial Bekins testified that he did not loan defendant any money to purchase the carload of brass; that the check to the Omaha bank was not a loan to defendant; that defendant did not owe him any money in connection with the carload of brass, and that he did not claim any lien against the carload of brass. Having testified in the instant case that he did not make any loan to the defendant and that he does not claim any lien on the carload of brass, it is difficult to understand how he can now contend that the transaction evidences a loan from him to defendant on the security of the warehouse receipt, for the amount of the purchase price, storage, freight and expenses paid by him and the interest thereon. We are satisfied that there is no merit in this contention.

Intervenor maintains that the admissions made on the first trial are of binding force on a retrial of the same cause, and that a tender made in open court admits every fact which the opposing party would have been required to prove to obtain a judgment. During the first trial while Bekins was on the stand, the attorney for plaintiff tendered to him a cashier's check in the sum of $5,626.40, payable to the order of plaintiff and indorsed by plaintiff. It was stated that this

check was 90% of the purchase price. This tender was made on April 12, 1937, not quite four months after the deal fell through. The tender was refused. It is obvious that the purpose of this tender was to renew the tender made by plaintiff at the Northern Trust Company of Chicago on the afternoon of December 15, 1936, and to show good faith on the part of plaintiff in offering to carry out the contract between plaintiff and defendant. It must be remembered that during the first trial, intervenor's theory was that defendant was acting as agent for the plaintiff in the purchase of the brass which was the property of intervenor. Plaintiff has consistently offered to carry out its part of the bargain with defendant. In the first trial defendant did not enter its appearance. Plaintiff, however, knew that the warehouse receipt was made out in the name of the intervenor, and despite the confusion caused by the actions of defendant, A. B. Alpirn, and intervenor plaintiff apparently was willing to keep alive the tender that it had made on December 15, 1936. Had intervenor accepted the tender, plaintiff would have been given possession of the warehouse receipt and would have taken the carload of brass subject to the payment of the remaining 10% of the purchase price, less charges on verification of the weight. It is difficult for us to understand how the intervenor can now contend that this tender should now be made good. It was a conditional tender. Manifestly, the tender was made on the condition that it would be accepted by the intervenor and that intervenor would turn over the warehouse receipt so that plaintiff could take possession of the brass. Notwithstanding the statement made in our last opinion, we are now of the opinion that under the record before us, the tender made on the first trial is not an irrevocable judicial admission, and that there is no obligation on the part of plaintiff to keep the tender good. We have examined the authorities cited on this point by intervenor and find that they are not applicable

to the factual situation before us. Intervenor urges that the burden is on the plaintiff to prove that the property was subject to attachment and that this is particularly true where the title papers, such as the warehouse receipt, is in the name of the intervenor, and that the attaching creditor does not occupy the position of an innocent purchaser. We hold that plaintiff has proven by a preponderance of the evidence that defendant is the owner of the brass, and that the intervenor does not have any lien on the brass. We agree with the statement of intervenor and defendant that the attaching creditor does not occupy the position of an innocent purchaser and that the burden of proof is on plaintiff. Intervenor also argues that the uncontradicted evidence is that he was in possession of the metal; that he paid the full purchase price; that there is no evidence legally tending to prove the contrary, and that the finding of the court that the intervenor is not the owner, cannot be sustained. There was competent evidence to support the judgment of the court, as our discussion on other points discloses.

Finally, intervenor urges that the warehouse receipt was brought from Nebraska to the court upon notice to produce, and when produced was impounded by the court; that when a nonresident suitor brings into the State for use in connection with the case to be tried, papers and books, they are exempt from attachment while such nonresident is in attendance in court and during the time for coming and returning. The warehouse receipt was offered in evidence by the intervenor at the first trial and was then impounded with the clerk. In the last trial the receipt was offered in evidence by plaintiff without objection from intervenor. Under the circumstances, the court did not err in impounding the warehouse receipt.

For the reasons stated, the judgment entered by the municipal court of Chicago on January 29, 1941, is modified by deducting therefrom the sum of $660 al-

lowed as interest, making the judgment $3,300.89, and as modified the judgment is affirmed.

*Judgment affirmed as modified.*

KILEY, J., concurs.

MR. JUSTICE HEBEL concurs with the court's conclusion affirming the judgment as modified but does not agree with all that is said in the opinion of the court.